RECEIPT #_____
AMOUNT $150
SUMMONS ISSUED YES
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. TOM
DATE 3/5/04

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

## 04 - 10460 GAO

FRANK QUAGLIA,

    Plaintiff,

      v.

BRAVO NETWORKS, NATIONAL
BROADCASTING COMPANY, INC.,
doing business as NBC; RAINBOW
PROGRAMMING HOLDINGS, INC., and
DOES 1-10.

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION

NO. _____

~~MAGISTRATE JUDGE~~ *Alexander*

COMPLAINT FOR:

(1) COPYRIGHT INFRINGEMENT;
(2) BREACH OF CONFIDENCE;
(3) BREACH OF IMPLIED CONTRACT

JURY TRIAL DEMAND

COMES NOW THE PLAINTIFF, FRANK QUAGLIA, WHO ALLEGES ON INFORMATION AND BELIEF AS FOLLOWS:

### JURISDICTION

1.    This is an action for copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§101 et seq. This Court has jurisdiction of this action under 28 U.S.C. §§1331, 1338(a) and (b). The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367. Venue is proper pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events or omissions on which the claim is based occurred in the District of Massachusetts. Venue is proper pursuant to 28 U.S.C. §1391(b)(1), as defendants reside in the District of Massachusetts. Venue is proper under 28 U.S.C. §1400(a). Damages exceed $75,000 exclusive of interests and costs.

### PARTIES

2.    Plaintiff Frank Quaglia ("Quaglia") is a resident of the District of Massachusetts, and the copyright infringements and state law claims have occurred

1

ORIGINAL

in the District of Massachusetts.

3.  On information and belief, Defendant Bravo Networks ("Bravo") is a d/b/a of Defendant National Broadcasting Company, Inc. ("NBC"). NBC is in turn a subsidiary of General Electric Co., a large conglomerate. On information and belief, NBC is a Delaware corporation. The principal place of business of Bravo is 30 Rockefeller Plaza, New York, New York. Bravo's recent promotional information brags that the channel has over 75 Million viewers.

4.  On information and belief, Bravo, until 2002, was owned by Defendant Rainbow Media Holdings, Inc. ("Rainbow"), which is located in Jericho, New York, as its principal place of business.

5.  On information and belief, NBC assumed the obligations and liabilities of Bravo when it acquired it from Rainbow; in any event, there has been one continuous obligation owed by Bravo, irrespective of its owner, to Quaglia.

6.  All actions of Bravo as alleged in the claims stated herein were ratified and approved by its lawyers, officers, directors, and managing agents.

7.  Defendants Does 1 through 10 are sued herein by fictitious names for the reason that their true names are unknown to Quaglia. Quaglia will seek leave to amend his complaint to allege the true names and capacities of these defendants when the same have been ascertained. Quaglia is informed and believes and based thereon alleges that these fictitiously named defendants are responsible in some manner for the actions and damages alleged herein.

8.  Each defendant at all times herein mentioned was the principal, agent, officer, servant, or employee of each of the remaining defendants, and in doing the acts hereinafter alleged was acting in the scope of such agency or employment with the knowledge, consent, permission, and approval of the remaining defendants.

9.  Plaintiff is informed and believes and hereby alleges that at all times mentioned herein, Defendants, and each of them, were the agents, servants, employees, partners, and/or joint venturers of their co-defendants and were, as such,

acting within the course, scope, and authority of said agency, employment, partnership, and/or venture.  On information and belief, Plaintiff alleges that the act of any Defendant, including those fictitiously named, is imputable to each and every other Defendant because one or more of the following relationships existed among the Defendants: principal-agent, employer-employee, partner, or such other relationship which would make any liability vicarious and imputable to such other Defendant or Defendants in such relationship.

**FIRST CLAIM FOR RELIEF**

**COPYRIGHT INFRINGEMENT**

**(17 U.S.C. §§101 et seq.)**

**Against all Defendants**

10.    All previous allegations are realleged and incorporated as though fully stated herein.

11.    Quaglia is a writer, filmmaker, and producer.  In 1992, Quaglia conceived of an unscripted documentary film in which unknown actors from New York City would audition for what they would think was to be a future movie project. However, the actors' auditions–along with their assessments of their own performances, their accounts of other audition experiences, their reactions to the audition process itself, and their individual and collective responses to their experience of that day, as captured by a roving cameraperson–would culminate in the revelation that Quaglia would include all of them in a groundbreaking movie that would explore the reality of their lives as actors, to be entitled *The Ultimate Audition*. The underlying premise and the expression thereof would be that the actors, auditions, accounts of other auditions, conversations, and experiences captured on the day *The Ultimate Audition* would be shot would comprise the movie itself.  Quaglia's intent was that the movie would serve as a model for an innovative television series about actors.

12.    Quaglia produced the film over the ensuing years, ultimately completing it in 1999.

13.    The Film was registered for copyright on September 28, 1998 and bears the registration number PAu2-335-401, a copy of which is attached hereto as Exhibit 1.

14.    Quaglia envisioned *The Ultimate Audition* as a pilot for a series and approached Bravo with his idea. Quaglia, by telephone pitched *The Ultimate Audition* to Bravo on or before April 15, 1999 (to Kelly Devine, assistant to Caroline Kaplan, at Rainbow Media), and on April 15 and 20, 1999 (to Mary, assistant to Laura Pierce, Director of Programming). On February 14, 2000, Quaglia spoke to Liz and/or Mary, assistants to Laura Pierce, who advised him to call Ms. Pierce the following day, and to send a fax with his proposal. Notes of these conversations are attached hereto as Exhibit 2.

15.    On February 28, 2000, Quaglia spoke with Ms. Pierce, who expressed interest and invited him to send *The Ultimate Audition* to her along with a cover letter. Exhibit 3.

16.    On March 30, 2000, Quaglia spoke with Ms. Pierce who said *The Ultimate Audition* was "too long" and "not compelling enough," but "close,"and she did have a note to possibly get a second opinion and she would let him know.

17.    On April 18, 2000, Quaglia received a rejection letter along with a copy of *The Ultimate Audition*. A copy of this is attached as Exhibit 4. On April 19, 2000, Quaglia sent a thank you letter to Ms. Pierce. A copy of this is attached as Exhibit 5.

18.    Sometime thereafter, in 2001, Bravo developed and produced a supposed "Bravo Original Production," entitled *The It Factor*. *The It Factor* commenced broadcast in January of 2002. It is a series that ran for two seasons (2002-2003). *The It Factor's* premiere episode and the first several minutes of the second episode contain the same premise and same expression of ideas, as *The Ultimate Audition*.

19.    Defendants had access to *The Ultimate Audition* for the reasons stated

above. Additionally, on information and belief, David Clair, the alleged "Creator" and a Producer of *The It Factor* was employed as an editor at Bravo at the time that Quaglia pitched *The Ultimate Audition* to Bravo in 1999 and 2000.

20.    Defendants have infringed the copyright of Quaglia in *The Ultimate Audition* by producing *The It Factor*. All shows have infringed.

21.    Quaglia is entitled to recover from Defendants statutory damages, including attorneys' fees. Quaglia will elect statutory damages or actual damages at trial.

22.    Quaglia seeks a permanent injunction prohibiting any further performances of *The It Factor* in any and all media and destruction of all infringing copies.

## SECOND CAUSE OF ACTION
## BREACH OF CONFIDENCE
### Against All Defendants

23.    All previous allegations are realleged and incorporated as though fully stated herein.

24.    In 1999 and 2000, Quaglia disclosed the confidential and new and novel ideas embodied in the Film to Bravo which accepted these ideas with the understanding and knowledge that: (1) the ideas were being disclosed in confidence, and (2) the ideas would be kept in confidence and not be disclosed, or used for purposes beyond the limits of the confidence, without Quaglia's consent.

25.    Bravo was provided with an adequate opportunity to reject Quaglia's disclosure of the novel ideas in *The Ultimate Audition* in advance. By accepting the submission, Bravo acknowledged that the ideas in *The Ultimate Audition* were novel and that Bravo would refrain from disclosing the novel ideas in it to anyone unless adequate assurances were obtained to prevent the exploitation of the novel ideas in a manner that would preclude Quaglia from obtaining monetary compensation and recognition in connection with any projects based on the novel ideas in *The Ultimate*

5

*Audition.*

26.    Bravo is well aware of the industry practice and standards governing submissions such as what occurred in this case, namely that it cannot use ideas from a submission without permission or compensation.

27.    Despite having voluntarily accepted Quaglia's confidence in Bravo's duty to protect the novel ideas in *The Ultimate Audition*, it breached its obligation of confidence by developing and producing *The It Factor*. At all relevant times herein, Bravo never contacted Quaglia to obtain his permission to allow Bravo to use the ideas in *The Ultimate Audition*.

28.    It was an implied agreement between Quaglia and Bravo that Quaglia would receive credit as the producer, creator, and writer of any production of his ideas, including without limitation for conceiving of, creating, and acting as a producer of *The It Factor*, in an amount that shall be proved at trial.

29.    As a direct and proximate result of Defendants' conduct, Quaglia has been damaged in an amount to be determined at the time of trial, plus interest thereon at a rate to be determined at the time of trial, but in excess of the jurisdiction of this Court.

30.    As a further direct and proximate result of Defendants' conduct, Quaglia has suffered and continues to suffer humiliation, embarrassment, and severe mental and emotional distress, and has been damaged in an amount to be determined at the time of trial.

### THIRD CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT
**Against All Defendants**

31.    All previous allegations are realleged and incorporated as though fully stated herein.

32.    In 1999, portions of Quaglia's novel idea were expressed to Mary, assistant to Laura Pierce, and in 2000, Bravo was first given access to Quaglia's novel

6

ideas for a motion picture when it received *The Ultimate Audition*. The ideas were disclosed by Quaglia for sale to Bravo and Bravo had an opportunity to reject the submission before Quaglia made it.

33.    Quaglia's disclosure of the ideas for the Film to Bravo was conditioned upon Bravo's agreement to pay for the use of the ideas.   As a result of Quaglia's disclosure of his ideas on the terms and conditions alleged above, Bravo and Quaglia entered into an implied-in-fact contract which required Bravo to compensate Quaglia for its use of Quaglia's novel ideas in *The Ultimate Audition* and to ensure Quaglia received appropriate producer and writer credits (including without limitation any "created by" credit) for any production based on Quaglia's ideas and production activities.

34.    Quaglia has performed each and every obligation required of him under and pursuant to the terms and conditions of the implied contract with Bravo.

35.    Bravo has breached the implied contract by not paying Quaglia based on the use of the novel ideas in the Film and to take the steps necessary to obtain for Quaglia a producer's, creator's and writer's credit with respect to *The It Factor*.

36.    As a direct and proximate result of Bravo's breach of the implied contract, Quaglia has been damaged in an amount to be determined at the time of trial, plus interest thereon at a rate to be determined at the time of trial.

WHEREFORE, Quaglia seeks statutory and compensatory damages and punitive damages in an amount to be proved at trial, a permanent injunction requiring destruction of the infringing product, attorneys fees, pre-judgment interest and such other relief as this Court deems just and equitable.

/ / /

/ / /

/ / /

/ / /

7

The plaintiff demands a trial by jury.

JOHNSON & RISHWAIN LLP

Dated: March 3, 2004                By: _____
                                    NEVILLE L. JOHNSON
                                    *Pro Hac Vice Pending*
                                    DOUGLAS L. JOHNSON
                                    *Pro Hac Vice Pending*
                                    **JOHNSON & RISHWAIN LLP**
                                    12121 Wilshire Boulevard,
                                    Suite 1201
                                    Los Angeles, California 90025-1175
                                    (310) 826-2410
                                    (310) 826-5450 (Fax)

Dated: March 5, 2004               By: _____
                                    CHRIS WINTON HENDERSON
                                    (B.B.O. No. 655321)
                                    57 Wharf Street
                                    Suite No. 3A
                                    Salem, Massachusetts 01970
                                    (978) 741-4646
                                    (978) 740-8880 (fax)

                                    Attorneys for Plaintiff,
                                    FRANK QUAGLIA

8