UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRANK QUAGLIA,                          )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  )   Civil Action No. 0410460 GAO
                                        )
BRAVO NETWORKS, NATIONAL                )
BROADCASTING COMPANY, INC.,             )
doing business as NBC, RAINBOW          )
PROGRAMMING HOLDINGS, INC.              )
and DOES 1-10,                          )
                                        )
            Defendants.                 )

**DEFENDANTS BRAVO AND NBC'S MEMORANDUM IN
OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL**

Defendants Bravo Company, sued herein as "Bravo Networks" ("Bravo"), and NBC Universal, Inc., formerly known and sued herein as "National Broadcasting Company, Inc." ("NBC"), by their undersigned attorneys, submit this memorandum in opposition to Plaintiff Pro Se Frank Quaglia's motion to compel production of certain documents and information. Factual information and exhibits relating to this opposition are set forth in the accompanying affidavits of Todd Saypoff, Bravo's Chief Financial Officer, and Frances Berwick, Bravo's Senior Vice President, Programming and Production.

To the extent not already resolved (see below), Plaintiff's motion should be denied in its entirety because it seeks documents and information that (a) have already been provided to him through his former counsel to the extent they were available; or (b) were made available to him through his former counsel for inspection and copying at the outset of discovery; or (c) as previously and repeatedly explained to his former counsel, have either never existed or have not been located despite diligent search.

Plaintiff's Motion seeks the following categories of documents and information, to which we will respond in turn:

**"1. Full Disclosure of Profit and Loss Statement (sic) and any relevant documents which show the specifics of how much money The It Factor series generated (2000-2005) from commercial advertising sales, product placement, merchandising, and ANY AND ALL REVENUES that were generated from the It Factor Series.**
   a. **All statements and analyses for all profits and losses for the It Factor television series from 2000 to the present.**
   b. **All documents relating net profits from the It Factor, including books, ledgers and quarterly and annual financial from 2000 to the present.**
   c. **All internal, external, and certified audits and associated work papers for the It Factor from 2000 to the present."**

Response:  Bravo and NBC's extensive responses to Plaintiff's Document Requests and Interrogatories are annexed hereto as Appendices A, B and C.  As repeatedly set forth in those discovery responses, and as confirmed in the accompanying affidavit of Todd Saypoff ("Saypoff Aff."), at paragraph 3, Bravo and NBC simply <u>do not</u> have documents or information responsive to the "profit and loss" and "net profits" aspect of these Requests and Interrogatories, because they do not maintain records that would identify net profits on a program-by-program basis for any Bravo programming.[1]  Moreover, as Mr. Saypoff further explains, NBC acquired Bravo from defendant Rainbow Media Holdings LLC ("Rainbow") in December 2002, <u>after</u> the first season of *The It Factor* had aired, and in the process of ownership transfer received extremely little in the way of historical financial information regarding specific Bravo programs. Saypoff Aff. at par. 2.  He and his department do not have any profit or loss statements, net profit (or loss) analyses, audits or audit work papers relating to *The It Factor* either pre-dating NBC's acquisition of Bravo or from the period following that acquisition.  Id.

With respect to the pure revenue -- or "how much money *The It Factor* series generated" -- aspect of Plaintiff's motion, Plaintiff neglects to inform the Court that Bravo did produce to

---

[1] Although Bravo and NBC's original responses to Plaintiff's Document Requests Nos. 5 and 6 referred to Bravo's maintenance of such net profit records for "two unrelated programs," that was based on counsel's error. There is no Bravo program for which that sort of comprehensive net profit information is maintained.

2

him, in response to his Document Request No. 13, a detailed schedule reflecting gross revenues (before deduction of 15% agency commission) booked on account of advertising sales for *The It Factor* following the acquisition of Bravo by NBC, based on data extracted from Bravo's computer records. See Saypoff Aff., par. 4 and Ex. 1. As explained in Bravo's response to that Request, and as Mr. Saypoff confirms in his affidavit, at par. 5, this schedule does not include revenue from ads that may have been inserted within particular episodes of *The It Factor* based on "Run of Schedule" sales (in which an advertiser purchases advertising time on a non-show-specific basis), or similarly non-show-specific "direct response" sales bookings, as to which NBC's and Bravo's present financial records do not permit isolation.

In its response to Plaintiff's Interrogatories 20 and 21, Bravo further identified one other source of at least theoretically related revenue, arising out of a programming licensing agreement that existed between 1993 and 2004 between Chum Limited (which operates the Canadian programming service known as "Bravo!") and Bravo that covered various Bravo programming assets, including, during the relevant period, *The It Factor*. However, as explained in Bravo's Interrogatory Responses, and as confirmed in the accompanying affidavit of Frances Berwick ("Berwick Aff."), at par. 2, Chum Limited paid an aggregate license fee for all programming licensed to it by Bravo based on a percentage of its gross revenues, and no amount was separately broken out as relating to distribution rights for *The It Factor*. Accordingly, Bravo has no documents or information that would enable isolation of distribution revenue that is directly or specifically attributable to *The It Factor*. Id.

Notably, as Plaintiff has further failed to advise the Court, Bravo has produced an extensive quantity of documents relating to the production fees it paid to the third party production company that produced *The It Factor*, Zanzibar Productions ("Zanzibar"), during both seasons that it aired. See Bravo's Responses to Plaintiff's Document Requests 7, 29 and 30.

3

Accordingly, when combined with the advertising revenue data produced by Bravo, Plaintiff has information that permits him to make a rough estimate of net "profits" (actually, extensive losses) at least for the second season of *The It Factor*, assuming that were a relevant data point.

**"2. ALL RAW VIDEO FOOTAGE (unedited) taken for the <u>NYC</u> premiere episode of The It Factor (Provide Plaintiff with VHS Format)."**

<u>Response</u>:  Bravo has never had possession of the raw videotape footage shot by Zanzibar for any of the episodes of *The It Factor*.  <u>See</u> Berwick Aff. at par. 3 and Bravo's Response to Plaintiff's Document Request No. 16.  At one point, in the context of discussions with Plaintiff's former counsel concerning the mechanics of retrieving the hundreds of hours of such footage from Zanzibar's storage facility and arranging for its "dubbing" from the Beta format in which it was shot to VHS format, Bravo/NBC's undersigned counsel referred to the fact that NBC's standard fee for copying or dubbing a videotape in response to a civil subpoena is $250.  Plaintiff's counsel never raised the subject again, in all likelihood because this evidence has virtually no relevance to any of Plaintiff's claims.  Since the Zanzibar videotapes in question are presently in the care of counsel for Rainbow purely as a transitional storage matter, Bravo and NBC respectfully refer the Court to, and join in, Rainbow's response with respect to this issue.  Bravo and NBC strenuously object to the imposition on them (or on Rainbow) of the cost and/or burden of dubbing this voluminous and irrelevant body of raw videotape.

**"3. VHS copy of The It Factor, episode 1 (premier) and episode 2 (aired versions)."**

<u>Response</u>:   Bravo and NBC identified all 26 episodes of *The It Factor* as relevant documents in their Initial Disclosures and made them available for inspection and copying. Plaintiff's former counsel never requested copies or an opportunity to inspect.  Bravo and NBC will provide copies of the requested episodes to Plaintiff, as well as any episodes they intend to submit to the Court in connection with their forthcoming motion for summary judgment.

**"4. Laura Pierce's 2000 Program Submission Log – Bravo"**

<u>Response</u>:   This document was never specifically requested by Plaintiff, but would surely have been produced in Bravo and NBC's Initial Disclosures or in response to Plaintiff's more general Document Requests if it existed and had been located in Bravo's search for documents.  As explained in Ms. Berwick's affidavit, Laura Pierce was a former Bravo employee who reviewed certain non-series programming submissions and who left Bravo's employ in 2001, approximately one year before NBC's acquisition of Bravo.  In connection with that acquisition in late 2002, Bravo moved its offices from Jericho, New York to NBC's headquarters in Rockefeller Center, and prior to that move discarded a large quantity of files, including, to Ms. Berwick's knowledge and belief, files of former employees such as Ms. Pierce that were no longer needed for Bravo's ongoing operations in its new home.  Berwick Aff., par. 4.  At that time, Plaintiff had not given Bravo any notice of any of his claims – indeed, he commenced this action in March 2004 without any prior notice or communication to Bravo.  Berwick Aff., par 5.  One of the unfortunate consequences of Plaintiff having waited until 2004 to commence an action without prior notice, concerning a submission he made to Bravo in 2000 and an allegedly infringing series that first aired in early 2002 and that was cancelled in 2003, is that certain potentially relevant documents – which could have aided Defendants as much as, if not more than, Plaintiff – either no longer exist or cannot be located.  Assuming Ms. Pierce's 2000 submission records in fact still existed at the time of Bravo's 2002 office move (which is by no means certain), it is possible they were discarded at that time, nearly two years before Plaintiff first gave notice of his claims.  In any event, they have not been located despite diligent search.  <u>Id</u>.

<u>Conclusion</u>

In sum, for the reasons stated above, Bravo or NBC submit that there is no basis for granting Plaintiff's motion to compel in any part against either of them, and that the motion should therefore be denied in its entirety, together with such other and further relief as the Court may deem just and proper.

Respectfully submitted,

BRAVO COMPANY (sued herein as BRAVO NETWORK) and NBC UNIVERSAL, INC. (formerly known as and sued herein as NATIONAL BROADCASTING COMPANY, INC.)

By their attorneys,

*[signature]*
Daniel M. Kummer (admitted *pro hac vice*)
NBC UNIVERSAL, INC.
30 Rockefeller Plaza, Rm. 1091E
New York, NY 10112
(212) 664-4017

Jonathan M. Albano, BBO #013850
BINGHAM MCCUTCHEN
150 Federal Street
Boston, Massachusetts 02110
(617) 951-8000

Dated: June 14, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 6/14/05

*[signature]*

6