UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------X
                                                         :
FRANK QUAGLIA,                                           :
                                                         :
       Plaintiff,                                       :
                                                         :
    -against-                                           :  Civil Action No. 04-10460 RWZ
                                                         :
BRAVO NETWORKS, NATIONAL                                 :
BROADCASTING COMPANY, INC., doing                        :
business as NBC; RAINBOW                                 :
PROGRAMMING HOLDINGS, INC., and                          :
DOES 1-10,                                               :
                                                         :
       Defendants.                                      :
---------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Table of Authorities | | iii |
| PRELIMINARY STATEMENT AND SUMMARY OF UNDISPUTED FACTS | | 1 |
| ARGUMENT | | 5 |
| I. | Summary Judgment is Appropriate in this Case. | 5 |
| II. | "The It Factor" was Independently Created by Zanzibar. | 7 |
| III. | Plaintiff Cannot Establish that Anyone Creatively Involved with "The It Factor" Copied or Had Access to His Film. | 8 |
| | A. Zanzibar Did Not Have a "Reasonable Opportunity to View" Plaintiff's Work Prior to Its Creation of "The It Factor." | 10 |
| | B. DeMontreux Had No Reasonable Opportunity to View Plaintiff's Work Prior to Producing "The It Factor" Series. | 11 |
| IV. | There is No Substantial Similarity between "The Ultimate Audition" and "The It Factor." | 13 |
| | A. Plaintiff Has No Protectible Right in the Idea of a Show About Actors Auditioning and the Only Common Elements of the Works are Unprotectible Scenes a Faire. | 14 |
| | B. There is No Substantial Similarity between Plaintiff's Expression of His Idea in "The Ultimate Audition" and the Allegedly Infringing Episodes of "The It Factor." | 17 |
| | 1. Theme | 18 |
| | 2. Setting, Plot, Sequence and Pace | 19 |
| | 3. Total Concept and Feel | 19 |
| V. | Defendants Are Entitled to Summary Judgment on Plaintiff's State Law Claims Because they are Preempted and Meritless. | 20 |
| | A. Plaintiff's Breach of Implied-in-Fact Contract Claim is Preempted by the Copyright Act. | 20 |
| | B. Plaintiff Cannot Raise a Genuine Issue of Fact on Any Element of His State Law Claims. | 23 |

|   |   |   | **Page** |
|---|---|---|---|
|   | 1. | Plaintiff's Breach of Confidence Claim Fails Because Plaintiff Did Not Have a Confidential Relationship with Bravo. | 23 |
|   | 2. | Plaintiff's Breach of Confidence and Breach of Implied-in-Fact Contract Claims Fail Because Bravo Did Not Misappropriate Plaintiff's Film or Ideas. | 24 |
| CONCLUSION | | | 25 |

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Arden v. Columbia Pictures Indus., Inc.,*
908 F. Supp. 1248 (S.D.N.Y. 1995) .......................................................................... 14

*Bolen v. Paragon Plastics, Inc.,*
747 F. Supp. 103 (D. Mass. 1990) ............................................................................ 22

*Capcom U.S.A., Inc. v. Data East Corp.,*
No. C93-3295 WHO 1994 WL 1751482 (N.D. Cal. Mar. 16, 1994) ........................ 16

*CBS Broadcasting Inc. v. ABC, Inc.,*
02 Civ. 8813 2003 U.S. Dist. LEXIS 20258 (S.D.N.Y. Jan. 13, 2003) ..................... 14

*Cepero-Rivera v. Fagundo,*
No. 04-1401, -- .3d -- 2005 WL 1543194 (1st Cir. July 1, 2005) ............................... 6

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,*
843 F.2d 600 (1st Cir. 1988) ............................................................................. *passim*

*Costello, Erdlen & Co. v. Winslow, King, Richards & Co.,*
797 F. Supp. 1054 (D. Mass. 1992) ............................................................................ 9

*Cox v. Abrams,*
No. 93 Civ. 6899, 1997 WL 251532 (S.D.N.Y. May 14, 1997) ................................. 6

*Data General Corp. v. Grumman Sys. Support Corp.,*
36 F.3d 1147 (1st Cir. 1994) ............................................................................... 21, 22

*Dimmie v. Carey,*
88 F. Supp. 2d 142 (S.D.N.Y. 2000) ...................................................................... 8, 9

*Eaton v. Nat'l Broad. Co.,*
972 F. Supp. 1019 (E.D. Va. 1997), *aff'd,* 145 F.3d 1324 (4th Cir. 1998) ................. 9

*Endemol Entm't B.V. v. Twentieth Television Inc.,*
48 U.S.P.Q. 2d 1524 (C.D. Cal. 1998) (available at 1998 WL 785300) ................... 22

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
499 U.S. 340 (1991) .................................................................................................. 14

*Fischer v. Viacom Int'l, Inc.,*
115 F. Supp. 2d 535 (D. Md. 2000) .......................................................................... 22

*Franklin v. Ciroli,*
865 F. Supp. 947 (D. Mass. 1994) ................................................................. 7, 15, 16

*Glanzmann v. King*,
  8 U.S.P.Q. 2d 1594 (E.D. Mich. 1988), *aff'd*, 887 F.2d 265 (6th Cir. 1989) .............. 12

*Grubb v. KMS Patriots, L.P.*,
  88 F.3d 1 (1st Cir. 1996) ........................................................................................... 5, 6, 8

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  723 F.2d 195 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985) ................ 21

*Hoch v. Mastercard Int'l Inc.*,
  284 F. Supp. 2d 1217 (D. Minn. 2003) ................................................................. 14-15

*Hoehling v. Universal City Studios, Inc.*,
  618 F.2d 972 (2d Cir. 1980) ............................................................................................ 7

*Hogan v. DC Comics*,
  48 F. Supp. 2d 298 (S.D.N.Y. 1999) ............................................................................. 15

*Incredible Technologies, Inc. v. Virtual Technologies, Inc.*,
  400 F.3d 1007 (7th Cir. 2005) ....................................................................................... 15

*Intersong-USA v. CBS, Inc.*,
  757 F. Supp. 274 (S.D.N.Y. 1991) .................................................................................. 9

*J. Irizarry y Puente v. President and Fellows of Harvard College*,
  248 F.2d 799 (1st Cir. 1957) .................................................................................... 24, 25

*Johnson v. Gordon*,
  409 F.3d 12 (1st Cir. 2005) ............................................................................................. 5

*Jorgensen v. Epic/Sony Records*,
  351 F.3d 46 (2d Cir. 2003) ............................................................................................ 12

*Markogianis v. Burger King Corp.*,
  No. 95 Civ. 4627 (JFK), 1997 WL 167113 (S.D.N.Y. Apr. 8, 1997) ........ 22, 23, 24, 25

*Moore v. Marty Gilman, Inc.*,
  965 F. Supp. 203 (D. Mass. 1997) ................................................................................ 24

*Nichols v. Universal Picture Corp.*,
  45 F.2d 119 (2d Cir.), *cert. denied*, 282 U.S. 902 (1931) ............................................ 18

*O'Neill v. Dell Publ'g Co.*,
  630 F.2d 685 (1st Cir. 1980) ........................................................................................... 7

*Pelt v. CBS, Inc.*,
  No. CV-92-6532 *LGB*, 1993 WL 659605 (C.D. Cal. Oct. 25, 1993) ........................... 15

*Reyher v. Children's Television Workshop*,
  533 F.2d 87 (2d Cir. 1976) ............................................................................................ 15

*Scholastic, Inc. v. Speirs,*
    28 F. Supp. 2d 862 (S.D.N.Y. 1998), *aff'd*, 199 F.3d 1323 (2d Cir. 1999) .................. 7

*Segal v. Paramount Pictures,*
    841 F. Supp. 146 (E.D. Pa. 1993), *aff'd*, 37 F.3d 1488 (3d Cir. 1994) ........................ 12

*Selle v. Gibb,*
    741 F.2d 896 (7th Cir. 1984) .............................................................................. 8

*Siskind v. Newton-John,*
    No. 84 Civ. 2634, 1987 WL 11701 (S.D.N.Y. May 22, 1987) ................................. 12

*Spiegelman v. Reprise Records,*
    35 U.S.P.Q. 2d 1732 (S.D.N.Y. 1995) (available at 1995 WL 322164), *aff'd*,
    101 F.3d 685 (2d Cir. 1996) ............................................................................... 9

*Tingley Systems, Inc. v. CSC Consulting, Inc.,*
    152 F. Supp. 2d 95 (D. Mass. 2001) .................................................................. 22

*Tisi v. Richard Patrick, Filter,*
    97 F. Supp. 2d 539 (S.D.N.Y. 2000) .................................................................. 12

*Tomasini v. Walt Disney Co.,*
    84 F. Supp. 2d 516 (S.D.N.Y. 2000) ................................................................... 9

*United States ex rel Berge v. Trustees of the Univ. of Ala.,*
    104 F.3d 1453 (4th Cir. 1997) ........................................................................... 21

*Walker v. Time Life Films, Inc.,*
    784 F.2d 44 (2d Cir. 1986) .......................................................................... 15, 16

*Warner Bros., Inc. v. Am. Broadcasting Cos.,*
    720 F.2d 231 (2d Cir. 1983) .......................................................................... 7, 13

*Williams v. Crichton,*
    84 F.3d 581 (2d Cir. 1996) .......................................................................... 15, 18

*Willis v. Home Box Office,*
    No. Civ. 2500, 2001 WL 1352916 (S.D.N.Y. 2001) ............................................. 16

*Yankee Candle Co. v. Bridgewater Candle Co.,*
    259 F.3d 25 (1st Cir. 2001) ......................................................................... 17, 18

**STATUTES**

17 U.S.C. § 102(b) ................................................................................................ 14, 21

Defendants National Broadcasting Company, Bravo Company, sued as Bravo Networks ("Bravo"), and Rainbow Media Holdings LLC, sued as Rainbow Programming Holdings, Inc. (referred to collectively as "Defendants"), jointly move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing all of the claims asserted by plaintiff Frank Quaglia ("Quaglia" or "Plaintiff") for copyright infringement, breach of confidence and breach of implied contract.[1]

## PRELIMINARY STATEMENT AND SUMMARY OF UNDISPUTED FACTS

On June 18, 1995, Plaintiff produced a film entitled "The Ultimate Audition." This film, shot in one day on a school campus in Worcester, Massachusetts is, according to Plaintiff, "the first and only movie ever shot in one day, without a script, with actors who did not know they were making a movie." Pl.'s Comparative Analysis ("Pl.'s Comparison") at 5 (Slotnick Decl., Ex. Y); Quaglia Dep. at 8, 10-11 (Slotnick Decl., Ex. A). The concept contrived by Plaintiff that enabled him to make his film was a hoax perpetrated on the unsuspecting actors.

Plaintiff placed an advertisement in the film trade press, soliciting actors to audition for a film. 5/19/95 Back Stage Ad (Slotnick Decl., Ex. C). Many actors and would-be actors traveled to the audition in Worcester, which was ostensibly conducted by people the actors believed to be casting directors. Although Plaintiff openly filmed the auditions and had a roving cameraman record the actors' comments and conversations, he also employed hidden cameras. At the end of the day, Plaintiff announced, to the surprise of the actors, that they had "just made a feature film in one day," i.e., that the auditions themselves and the related activities were "the film" and that

---

[1] All cited deposition pages and declarations herein will be abbreviated as follows: "[Deponent's surname] Dep." and "[Declarant's surname]" Decl.," respectively.

there was, in fact, no other film project for which they were auditioning. VHS Tape of "The Ultimate Audition" (Slotnick Decl., Ex. B).

In 1999 and 2000, Plaintiff pitched his film to more than a dozen broadcasters networks and producers, all of whom rejected his work. (Pl.'s Interrog. Resp. No. 10.) On March 1, 2000, Plaintiff sent his film to Laura Pierce, Director of Programming at defendant Bravo, who also rejected his submission – first in a telephone conversation on March 30, 2000, and later in a letter dated April 11, 2000 – without showing it to or discussing it with anyone else at Bravo. Pl.'s Interrog. Resp. No. 11; Pierce Decl. ¶ 5 & Ex. A thereto.

During this same 1999 to 2000 time period, Nicole Torre, David Clair and Lauren Friedland, principals of Zanzibar Productions (collectively, "Zanzibar"), a television production company, were developing an idea for a television series that eventually came to be titled, "The It Factor." Roughly based upon Torre's experiences as a struggling actress, the series was developed in the late summer of 1999 as a documentary about the day-to-day struggles of young actors in New York, showing them looking for work and interacting in their off-hours with family and friends, hoping for the break that would make them stars.

In October 1999, Zanzibar pitched the series idea, then entitled "The Audition," to American Movie Classics ("AMC"). The written proposal describes the same concept of documenting actors' personal and professional lives as "The It Factor:"

> a fast-paced 'real people' series following several actors and actresses who are all auditioning for the same roles. In a one-hour pilot and thirteen half-hour episodes, we get an up close look at the audition process, from the anonymous 'cattle call' to the birth of a star. Our goal is to take the audience past the hairstyles, big white-toothed smiles and clichés. The Audition will reveal these actors as individuals.

Friedland Decl., Ex. C.

To accompany their written proposal, in December 1999, Zanzibar filmed a short demonstration tape of actors auditioning for a commercial that Friedland was producing. Friedland Decl. ¶ 9 & Ex. H thereto (Zanzibar Pitch Tape) (the "demo tape"). The demo tape follows actors from an audition through the days of waiting for a call back, and includes the actors' reflections on their experiences as actors. Zanzibar shot additional footage and refined the demo tape over the next several months. Friedland Decl. ¶ 10.

Zanzibar screened the demo tape with executives from AMC in March 2000. Friedland Decl. ¶ 11 & Ex. F thereto. Although AMC ultimately passed on the project, it referred Zanzibar to its sister channel, Bravo. Friedland Decl. ¶ 7.

In June 2000, Zanzibar submitted the demo tape and the written proposal for "The It Factor" to Bravo. 6/27/00 letter (Friedland Decl., Ex. I). In August 2000, Debbie DeMontreux, Bravo's Director of Development and Production of Original Series, contacted Friedland to express Bravo's interest in developing the series. DeMontreux Decl. ¶ 8; Friedland Decl. ¶ 14. DeMontreux later became the executive producer of the series, "The It Factor." DeMontreux Decl. ¶ 11.

Zanzibar's principals, Friedland, Clair and Torre, decided to film the process of selecting the actors for the series and include the auditions as part of the first episode of the series. Friedland Decl. ¶ 17; DeMontreux Decl. ¶ 10. They hired a well-known casting director, Billy Hopkins, to run the auditions. Friedland Decl. ¶ 17. Together with Zanzibar, Hopkins selected the actors who would star in "The It Factor." Id. At all times, the actors knew that the audition was for a Bravo documentary series. See 2/16/01 Back Stage Ad ("A major cable network is casting for a new reality series, 'The It Factor,' which explores the life of an actor.") (Slotnick Decl., Ex. M); Torre Dep. at 50-51 (Slotnick Decl., Ex. I). The series was first broadcast on

3

January 6, 2002. "The It Factor" Episodes & Air Dates Guide (Slotnick Decl., Ex. V).

Before this lawsuit commenced, none of the Zanzibar producers and none of the Bravo executives who were in any way involved with developing "The It Factor" series had ever heard of Plaintiff or "The Ultimate Audition." Friedland Decl. ¶ 19; Clair Dep. at 77 (Slotnick Decl., Ex. J); Torre Dep. at 88 (Slotnick Decl., Ex. I); DeMontreux Decl. ¶¶ 4-5 & Ex. A thereto. Laura Pierce, the sole Bravo executive to whom Plaintiff submitted his film, testified that she never discussed either Plaintiff or his film with anyone else at Bravo, much less anyone involved in "The It Factor." (Pierce Decl. ¶¶ 5, 8.) Nor did she show the film or any portion of it to anyone at Bravo or Zanzibar. (*Id.* ¶ 5.)

Nonetheless, Plaintiff has decided that "The It Factor" is a slavish copy of his film and has sued claiming that the entire two-season, 26-episode series infringes his copyright, *while alleging similarities only in the first episode and the opening minutes of the second.* He also asserts state law claims generally characterized as theft of ideas.

Defendants move for summary judgment because there is no genuine issue of material fact that would warrant a trial on any of Plaintiff's claims. First, the evidence is undisputed that Zanzibar, the non-party creators and producers of "The It Factor," created their series independently of and prior to Bravo receiving a copy of Plaintiff's film. Second, a simple viewing of Plaintiff's film and "The It Factor" series will establish that these are very different works, which share only the general subject matter of actors seeking employment. Plaintiff's work is all about the audition, however artificial that audition may have been. "The It Factor," on the other hand, is a discerning and detailed look at actors' real lives, personally and professionally, during the course of many months. Plaintiff alleges similarities that are either non-existent or merely a function of the overall subject matter and idea, not the expression of

that idea. Documentaries about struggling young actors will, of necessity, include attractive, young people going to auditions. And a series seeking mainstream audiences will, of necessity, require a cast composed of multiple ethnicities and cultures.

Simply stated, Plaintiff seeks to monopolize the idea of a program about actors and auditions. This is improper in an action for either infringement or theft of idea liability. Plaintiff was free to develop his film. Defendants had the right to broadcast their series, which was independently created by Zanzibar. Both are very different variations of a theme that has been used many times before.

## ARGUMENT

I.    **Summary Judgment is Appropriate in this Case.**

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Johnson v. Gordon*, 409 F.3d 12, 16-17 (1st Cir. 2005) (citations omitted). Where, as here, "the nonmovant bears the ultimate burden of proof on a given issue, he must make a factual showing, by means of competent and specific evidence, sufficient to establish the essential elements of his claim."[2] *Id.* Although the court must view the inferences to be drawn from the facts in the light most favorable to the non-movant, the non-movant may not rely upon "conclusory allegations, improbable inferences, and unsupported speculation" to create a question of material fact where none would otherwise exist. *Cepero-Rivera v. Fagundo*, No. 04-1401, -- F.3d --, 2005 WL 1543194, at *5 (1st Cir. July 1, 2005).

---

[2]    See *Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 3 (1st Cir. 1996) ("Under Rule 56(c), the opponent of the motion must produce evidence on which a reasonable finder of fact, under the appropriate burden, could base a verdict for the opponent; if the opponent cannot produce such evidence, the motion must be granted.").

"To prevail on a claim of copyright infringement, a plaintiff must show two elements: (1) ownership of a valid copyright and (2) copying of the protected work by the alleged infringer." *Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 3 (1st Cir. 1996). Proof of copying by direct evidence "is generally not possible since the actual act of copying is rarely witnessed or recorded." *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606 (1st Cir. 1988). "Absent direct evidence, copying may be inferred from a showing that the defendant had 'access' to the plaintiff's work prior to the creation of defendant's work, and that there is 'substantial similarity' between the works." *Grubb*, 88 F.3d at 3 (citations omitted). However, even if both elements are established, the court may find no copying if the defendants establish independent creation. *Id. See Concrete Mach.*, 843 F.2d at 606 n.6.

Summary judgment is routinely granted where, as here, the defendant establishes that the allegedly infringing work is an independent creation. *See, e.g., Grubb*, 88 F.3d at 3 (granting summary judgment to defendant where evidence demonstrated he composed his design independently of and prior to plaintiff's work); *Cox v. Abrams*, No. 93 Civ. 6899, 1997 WL 251532, at *7 (S.D.N.Y. May 14, 1997) (granting summary judgment based on uncontroverted evidence of independent creation). Similarly, if there is no evidence showing that persons creatively involved with the allegedly infringing work had access to plaintiff's work, defendants are entitled to summary judgment on this ground alone. *See Grubb*, 88 F.3d at 3 (where plaintiff has failed to raise a genuine issue of material fact with respect to defendants' "access," "this deficiency alone suffices to justify summary judgment.").

Even if the plaintiff succeeds in raising a question of fact as to copying, mere copying will not state a claim for copyright infringement. "[A] court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two

works concerns only 'non-copyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros., Inc. v. Am. Broadcasting Cos.*, 720 F.2d 231, 240 (2d Cir.1983). *See also O'Neill v. Dell Publ'g Co.*, 630 F.2d 685 (1st Cir. 1980); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir. 1980); *Franklin v. Ciroli*, 865 F. Supp. 947 (D. Mass. 1994).

Defendants are entitled to summary judgment on Plaintiff's copyright and state law claims as a matter of law for each of the following reasons, ***any one of which*** is sufficient to defeat Plaintiff's claims: ***first***, it is indisputable that "The It Factor" was independently created by Zanzibar; ***second***, there is absolutely no evidence that Defendants actually copied Plaintiff's work because no one creatively involved with "The It Factor" had access to Plaintiff's work; and ***third***, Plaintiff's work and "The It Factor" are not substantially similar and no reasonable observer could conclude otherwise.

## II.   "The It Factor" was Independently Created by Zanzibar.

Plaintiff's copyright claim fails as a matter of law because even if he could establish substantial similarity, the evidence undeniably demonstrates that "The It Factor" was independently created by Zanzibar ***before*** Plaintiff submitted his work to Bravo in March 2000.

Evidence of independent creation defeats a copyright infringement claim. *See, e.g., Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606 (1st Cir. 1988) ("Although access plus substantial similarity generally is required to show copying, the trier of fact may nonetheless find no copying if the defendant shows independent creation."); *Scholastic, Inc. v. Speirs*, 28 F. Supp. 2d 862, 869 (S.D.N.Y. 1998), *aff'd*, 199 F.3d 1323 (2d Cir. 1999) (evidence of independent creation of humanized skeleton character, consisting of uncontradicted affidavits of creators together with paper trail of memos and sketches, defeats copyright infringement claim); *Dimmie v. Carey*, 88 F. Supp. 2d 142, 150 (S.D.N.Y. 2000) (evidence

7

consisting of working tapes and journal kept by songwriter, showing creative steps taken to produce allegedly infringing song and evolution of lyrics, constituted substantial evidence of independent creation, entitling defendants to summary judgment).

Plaintiff does not challenge Zanzibar's independent creation of "The It Factor" in the late summer of 1999, months before Plaintiff submitted his film to Bravo in March 2000. This alone is sufficient to grant summary judgment to Defendants. *See Grubb*, 88 F.3d at 5 (affirming summary judgment where uncontroverted testimony established that defendant created his design before plaintiff created his: "Such prior creation renders any conclusion of access or inference of copying illogical.").[3]

### III. Plaintiff Cannot Establish that Anyone Creatively Involved with "The It Factor" Copied or Had Access to His Film.

Defendants are entitled to summary judgment on Plaintiff's copyright claims because Plaintiff cannot prove that the creators of "The It Factor" had access to Plaintiff's work prior to their creation of "The It Factor." *See Grubb*, 88 F.3d at 3.

Where, as here, there is no direct evidence of copying or that the creators of the allegedly infringing work actually viewed the plaintiff's work prior to their creation, "'[a]ccess may be shown inferentially with evidence that defendant had reasonable opportunity to view the protected work." *Costello, Erdlen & Co. v. Winslow, King, Richards & Co.*, 797 F. Supp. 1054, 1061-62 (D. Mass. 1992) (citations omitted). Plaintiff cannot raise a question of fact as to copying with "[e]vidence that only creates a 'bare possibility' that the defendant had access."

---

[3] *See Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984) ("two works may be identical in every detail, but, if the alleged infringer created the accused work independently or both works were copied from a common source in the public domain, then there is no infringement") (cited with approval in *Grubb*).

*Grubb*, 88 F.3d at 3. Rather, a plaintiff must present "'significant, affirmative and probative' evidence to support claim of access. Conjecture or speculation of access will not suffice." *Intersong-USA v. CBS, Inc.*, 757 F. Supp. 274, 281 (S.D.N.Y. 1991). A plaintiff must demonstrate how his copyrighted work was transmitted from the alleged recipient to the creator of the purportedly infringing work. *See Dimmie*, 88 F. Supp. 2d at 145-48 (collecting cases).

Courts routinely grant summary judgment dismissing copyright claims where, as here, the plaintiff fails to submit sufficient evidence to establish the defendant's access to the work. *See, e.g., Grubb*, 1 F.3d at 3; *Tomasini v. Walt Disney Co.*, 84 F. Supp. 2d 516, 519 (S.D.N.Y. 2000); *Eaton v. Nat'l Broad. Co.*, 972 F. Supp. 1019, 1022-27 (E.D. Va. 1997), *aff'd*, 145 F.3d 1324 (4th Cir. 1998); *Spiegelman v. Reprise Records*, 35 U.S.P.Q.2d 1732, 1733 (S.D.N.Y. 1995) (available at 1995 WL 322164), *aff'd*, 101 F.3d 685 (2d Cir. 1996). Plaintiff has not met – and cannot meet – this burden. There is no proof that any of the Zanzibar producers or DeMontreux for Bravo had a "reasonable opportunity to view" Plaintiff's work either prior to Zanzibar's creation of what later became known as "The It Factor" in August 1999, or prior to DeMontreux's production of "The It Factor" series for Bravo. In fact, none of "The It Factor" creators had ever heard of Plaintiff or his film until after this action was commenced. *See* Friedland Decl. ¶ 19; Clair Dep. at 77 (Slotnick Decl., Ex. J); Torre Dep. at 88 (Slotnick Decl, Ex. I).

Plaintiff's allegations of access are limited to his unsolicited submission of "The Ultimate Audition" to Laura Pierce in March 2000, and Clair's alleged employment as an editor at Bravo at the time of that submission. (Compl. ¶¶ 14-19.) (Slotnick Decl., Ex. F). Neither supports an inference of access.

9

### A. Zanzibar Did Not Have a "Reasonable Opportunity to View" Plaintiff's Work Prior to Its Creation of "The It Factor."

The evidence indisputably demonstrates Zanzibar's independent creation of "The It Factor" prior to Plaintiff's submission of his film to Bravo in March 2000. *See* Friedland Decl. ¶¶ 2, 4; Torre Dep. at 14 (Slotnick Decl., Ex. I); Clair Dep. at 33-36, 120 (Slotnick Decl., Ex. J). Zanzibar's independent creation is corroborated by:

- Clair's August 25, 1999 e-mail to Friedland with a rough outline for "The Audition," three one-hour programs giving "an in-dept ... look at ten aspiring actresses all auditioning for the same part." The viewer would "get a glimpse inside their world, get to know them," and get to experience their "excitement, frustration, elation and self[-]doubt." Friedland Decl. ¶ 4; Clair's 8/25/99 e-mail (Friedland Decl., Ex. A);

- Clair's September 2, 1999 e-mails (Friedland Decl., Ex. B) refining the proposal;

- Zanzibar's October 1999 submission of a written proposal for "The Audition" to Paula Connelly and Alice Peck at AMC. Friedland Decl. ¶ 7;

- Zanzibar's December 1999 submission of a written proposal to Bridget Potter at Warner Bros. Television. Friedland Decl. ¶ 8; 12/21/99 letter (Friedland Decl., Ex. E); 5/11/00 e-mail (Friedland Decl., Ex. F);

- Zanzibar's December 1999 footage for its demo tape, showing actors auditioning for a corporate video that Friedland was producing. Friedland Decl., ¶ 9; 8/28/00 e-mail (describing first audition scene as filmed at Winstar's offices in December 1999) (Friedland Decl., Ex. G); and

- Clair's journal notes regarding the genesis of "The It Factor" (Slotnick Decl., Ex. K), and the list of documents on Clair's computer hard drive, with the dates they were last modified. Slotnick Decl., Ex. H.

Zanzibar thus created "The It Factor" independent of and before Plaintiff submitted his work to Pierce in March 2000. Plaintiff does not contend there were any other opportunities prior to his submission to Bravo that prove Zanzibar had a "reasonable opportunity to view" his work.

There is no evidence or even suggestion that Zanzibar had access to Plaintiff's work. Although Plaintiff's Complaint alleges, on information and belief, that Clair was an "editor at Bravo" at the time of Plaintiff's submission (Compl. ¶ 19) (Slotnick Decl., Ex. G), Clair's

deposition testimony establishes that he was a freelance editor at the time, that he edited promotional spots for Bravo through an independent editing company, and never worked in Bravo's offices in Manhattan or on Long Island where DeMontreux was based. Clair Dep. at 19-20 (Slotnick Decl., Ex. J).

More to the point, the undisputed deposition testimony of Clair, Torre and Friedland proves that prior to this suit, no one at Zanzibar had ever heard of Plaintiff's film and, to date, none of them has seen it. Friedland Decl. ¶ 19; Clair Dep. at 77 (Slotnick Decl., Ex. J); Torre Dep. at 88 (Slotnick Decl., Ex. I). There is no evidence that Friedland, Torre or Clair ever spoke with Laura Pierce or anyone else who allegedly was aware of Plaintiff's film. Friedland Dep. at 51 (Slotnick Decl., Ex. L); Clair Dep. at 89 (Slotnick Decl., Ex. J); Torre Dep. at 88 (Slotnick Decl., Ex. I); Pierce Decl. ¶ 8.

### B. DeMontreux Had No Reasonable Opportunity to View Plaintiff's Work Prior to Producing "The It Factor" Series.

Plaintiff also cannot establish access based on his submission of his film to Bravo's Laura Pierce, who was not involved in the production of "The It Factor" series and never discussed Plaintiff's work with any person who was involved with the production of that series or DeMontreux in particular. The undisputed evidence proves that Pierce never discussed the content of Plaintiff's film with anyone at Bravo, and that Pierce was the only person at Bravo who saw Plaintiff's work. Pierce Decl. ¶¶ 18, 25-27.

Plaintiff's submission to Pierce does not constitute access. "Bare corporate receipt of [plaintiff's] work, without any allegation of a nexus between the recipients and the alleged infringers, is insufficient to raise a triable issue of access." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 53 (2d Cir. 2003). *See Tisi v. Richard Patrick, Filter*, 97 F. Supp. 2d 539, 547-48 (S.D.N.Y. 2000) (finding no proof of access where plaintiff allegedly sent unsolicited tapes to

record company that released records containing the allegedly infringing song, but there was no evidence that plaintiff's song was conveyed to anyone with creative input into the allegedly infringing song); *Siskind v. Newton-John,* No. 84 Civ. 2634, 1987 WL 11701, at *5 (S.D.N.Y. May 22, 1987) (granting defendants' motion for summary judgment and stating that, "[t]he most that plaintiff can be said to have shown is that the [plaintiff's] tape was in the possession of [the recording company's] personnel.... It must be concluded that plaintiff has made no showing of access which is even sufficient to raise a triable issue of fact.").

Access is not established where, as here, there is no connection between the recipient of the plaintiff's work and persons involved in the creation or development of the allegedly infringing work. *See Segal v. Paramount Pictures*, 841 F. Supp. 146, 150 (E.D. Pa. 1993), *aff'd*, 37 F.3d 1488 (3d Cir. 1994) (no access where an unsolicited submission of a movie screenplay was sent to defendant, but no one at defendant's office who was involved in developing the relevant movie saw the screenplay); *Glanzmann v. King*, 8 U.S.P.Q.2d 1594 (E.D. Mich. 1988), *aff'd*, 887 F.2d 265 (6th Cir. 1989) (holding that the mere receipt of an unsolicited manuscript by a film company was not proof of access because the company received many unsolicited submissions and plaintiff failed to establish that the author of the allegedly infringing work ever saw plaintiff's manuscript).

The record evidence confirms that there was no operational nexus between Pierce and DeMontreux. They performed entirely different job functions – Pierce worked on acquisitions of finished programs, and DeMontreux worked exclusively on production and development of pilots and series. Pierce Decl. ¶ 1; DeMontreux Decl. ¶ 1. Both Pierce and DeMontreux testified that Pierce did not discuss submissions for proposed acquisitions with DeMontreux as a matter of course, that Pierce never showed or mentioned Plaintiff's film to DeMontreux. Pierce Dep. at 72