(Slotnick Decl., Ex. X); Pierce Decl. ¶¶ 1, 3, 5; DeMontreux Dep. at 71-71 (Slotnick Decl., Ex. W); DeMontreux Decl. ¶¶ 3-5. Indeed, the evidence shows that Pierce and DeMontreux did not collaborate professionally at all, and their conversations were limited to casual office interaction.

In sum, the circles that comprise the "Venn Diagram" of this case simply do not intersect. The evidence is undisputed that Plaintiff's film came in the door to Bravo to Laura Pierce as a proposed acquisition, was rejected, and exited through the same door without having crossed the desks or passed the eyes and ears of *anyone* associated with the development or production of "The It Factor." Accordingly, Plaintiff's copyright claim (and state law idea theft claims) fail as a matter of law.

**IV.   There is No Substantial Similarity between "The Ultimate Audition" and "The It Factor."**

Summary judgment should be granted where "the similarity between the two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros., Inc. v. Am. Broadcasting Cos.*, 720 F.2d 231, 240 (2d Cir. 1983) (internal quotation marks and citations omitted); *Concrete Machinery Co. v. Classic Lawn Ornaments*, 843 F.2d 600 (1st Cir. 1988); *O'Neill*, 650 F.2d 685 (copyright protection does not extend to ideas, plot, dramatic situations and events).

A viewing of the videotapes of these works will readily confirm that these are two very different works, whose only similarity is that both concern the general idea of actors looking for work. *Compare* "The Ultimate Audition" (Slotnick Decl., Ex. B), *with* "The It Factor," Episodes 101 through 105, 112 and 113 (Slotnick Decl., Exs. N through T, respectively.) The general idea and the scenes that necessarily follow are not protectible elements of Plaintiff's work, and once

those unprotectible elements are removed from the analysis, there is nothing to show that "The It Factor" is even remotely similar, let alone substantially similar, to Plaintiff's work.

### A.  Plaintiff Has No Protectible Right in the Idea of Actors Auditioning and the Only Similarities in the Works are Unprotectible Scenes a Faire.

"It is a principle fundamental to copyright law that a copyright does not protect an idea, but only the expression of an idea." *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) (citations and internal quotation marks omitted).[4] "[C]opyright does not protect facts, generalized themes and ideas, subthemes, stock themes, general imagery, literary formulas, actual, true or historical events, episode or scenes a faire, scenes that necessarily result from the choice of a setting [or] situation." *CBS Broadcasting Inc. v. ABC, Inc.*, 02 Civ. 8813 (LAP), 2003 U.S. Dist. LEXIS 20258, at 2 (S.D.N.Y. Jan. 13, 2003) (collecting cases). *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350 (1991) (recognizing that the idea/expression dichotomy "severely limits" the scope of protection of fact-based works).

Plaintiff seeks to monopolize the idea of a program relating to actors and auditions. However, courts have repeatedly held that such generalized themes are not protectible. *See, e.g., Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1258-59 (S.D.N.Y. 1995) (idea of man trapped in a repeated day not protectible); *Hoch v. Mastercard Int'l Inc.*, 284 F. Supp. 2d 1217, 1223 (D. Minn. 2003) (idea of a baseball stadium road trip by automobile is an unprotected stock theme).

Nor can Plaintiff show copyright infringement based on the characters and subplots that necessarily result from following actors on auditions, which are unprotectible scènes à faire. The

---

[4] Section 102(b) of the Copyright Act provides: "In no case does copyright protection for an original work of authorship extend to any idea, .... concept, principle or discovery, regardless of the form in which it is described, explained, illustrated or embodied in such work." 17 U.S.C. § 102(b).

doctrine of scènes à faire refers to "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of given topic," which are not protectible by copyright. *Incredible Technologies, Inc. v. Virtual Technologies, Inc.* 400 F.3d 1007, 1012 (7th Cir. 2005). *See Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir. 1986); *Reyher v. Children's Television Workshop*, 533 F.2d 87 (2d Cir. 1976). Any documentary about struggling actors will, of necessity, show actors on auditions, bring out their insecurities and depict the casting process. *See Franklin v. Ciroli*, 865 F. Supp. 947, 950 n.5 (D. Mass. 1994) (sequence of events of wedding unprotectible); *Williams v. Crichton*, 84 F.3d 581, 587-90 (2d Cir. 1996) (finding common elements of electrified fences, automated tours, dinosaur nurseries and uniformed workers were scenes a faire that flowed from the concept of a dinosaur zoo). Similarly, the process of making a documentary with handheld cameras following their subjects is simply not protectible. *See Pelt v. CBS, Inc.*, No. CV-92-6532 LGB, 1993 WL 659605, at *3 (C.D. Cal. Oct. 25, 1993) (format similarities that permeate every television talk show, including opening song, moderator, audience participation and panel of guests not protectible). Plaintiff cannot sustain a copyright infringement claim based on these unprotectible elements.

Plaintiff's claims of similarity in the characters in his film and Bravo's series are based on age, ethnicity, gender, appearance and personality are equally deficient. Character types do not merit copyright protection and Plaintiff's "characters" are nothing more. *See Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y.1999) ("A stock character or basic character type ... is not entitled to copyright protection."); *Capcom U.S.A., Inc. v. Data East Corp.*, No. C93-3295 WHO, 1994 WL 1751482, at *15 (N.D. Cal. Mar. 16, 1994) ("Capcom cannot obtain copyright protection for the unoriginal portrayal of a stereotyped character."). Indeed, Plaintiff has

characterized his own actors as "tough" or "artistic." Pl.'s Comparison (Slotnick Decl., Ex. Y). These ill-defined "types" are not protectible characters.

For example, Plaintiff contends that the actress Nikki in his film and Daisy in Bravo's series are substantially similar because both are in their "20's, white female[s], wholesome" with light brown hair with "sweet, family-oriented, girl-next-door" personalities. Pl.'s Comparison at 11. Plaintiff's selection of a demographic and personality type does not constitute the creation of a protectible character, as scripted characters with far more specificity are not entitled to copyright protection. "A person may not obtain a copyright on a particular type of character, particularly if this character represents a recognizable stereotype." *Franklin v. Ciroli*, 865 F. Supp. 947, 949 (D. Mass. 1994) (jealous ex-girlfriend and "Godfather" figure, represent distinct stereotyped characters not protected by copyright). *See Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (no copyright violation where both works "feature as central characters third- or fourth-generation Irish policemen who live in Queens and frequently drink; both show disgruntled, demoralized police officers and unsuccessful foot chases of fleeing criminals."); *Willis v. Home Box Office*, No. CIV 2500, 2001 WL 1352916, at *3 (S.D.N.Y. 2001) (characters who was a stereotype of the amoral talent agent was not a protectible element of plaintiff's work).

Plaintiff also cannot establish substantial similarity based upon any comparison of the dialogue of the actors in the films because Plaintiff has no protectible interest in that dialogue. Plaintiff did not script the dialogue of the actors who appear in his film. Quaglia Dep. at 10-11 (Slotnick Decl., Ex. A). Therefore, he cannot claim any copyright in their dialogue based upon his authorship. Furthermore, Plaintiff received no assignment of copyright from the actors who appeared in his film. Although they consented to appear in the film and entered into a contract to

16

share in the proceeds from its distribution, the contracts contain no language assigning their copyright in their own dialogue. *See* Slotnick Decl., Exs. D and E.

The unprotectible elements of Plaintiff's work cannot be considered in determining whether the allegedly infringing episodes of "The It Factor" are substantially similar to "The Ultimate Audition." *See Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 33-34 (1st Cir. 2001) ("Because of this dichotomy between 'idea' and 'expression,' only the 'protected expression' is relevant to an evaluation of substantial similarity."); 3 Nimmer § 13.03[F], at 13-124 ("[i]nfringement is shown by a substantial similarity of *protectible expression*, not just an overall similarity between the works.").

> **B. There is No Substantial Similarity between Plaintiff's Expression of His Idea in "The Ultimate Audition" and the Allegedly Infringing Episodes of "The It Factor."**

Once the unprotectible elements of Plaintiff's work are filtered out, there can be no genuine issue of fact about the utter lack of substantial similarity between Plaintiff's work and "The It Factor." Plaintiff asserts that the premiere episode and the first several minutes of the second episode of "The It Factor" "contain the same premise and same expression of ideas" as "The Ultimate Audition. (Compl. ¶ 18.) However, premises – like ideas – are not protectible, and Plaintiff's conclusory allegation of substantial similarity of expression is not supported by facts.

In determining whether substantial similarity exists, "[t]he test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Concrete Mach*, 843 F.2d at 607 (citation omitted). The Court "must take care to inquire only whether 'the protectable elements, standing alone, are substantially

similar.'" *Williams*, 84 F.3d at 588 (citation omitted). *See Yankee Candle*, 259 F.3d at 33-34. Judge Learned Hand's "abstractions" test describes this distinction:

> Upon any work, ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected....

*Nichols v. Universal Picture Corp.*, 45 F.2d 119, 121 (2d Cir.), cert. denied, 282 U.S. 902 (1931).

The courts analyze protectible similarities by considering elements such as the theme, characters, plot, dialogue, mood, sequence, pace and setting, as well as the total concept and feel of the respective works to determine substantial similarity. *See Williams*, 84 F.3d at 588. Defendants are entitled to summary judgment because no reasonable observer could find any similarities in the protectible aspects of any of these elements in "The Ultimate Audition" and "The It Factor."

### 1. Theme

The theme of *The Ultimate Audition* is the making of an unscripted movie, in a single day, with actors who do not know they are making a movie. The hallmark of Plaintiff's film is the deception of the actors. Plaintiff purposely concealed the true nature of his project, and deceived the actors into believing they were auditioning with real casting directors, for a film that was "contracted with an international distributor." Back Stage Press Ad (Slotnick Decl., Ex. C). The sham audition is both the lure for the actors and the centerpiece of Plaintiff's film.

In contrast, "The It Factor" documents the actual struggles of a group of young actors. They are followed for weeks and months to depict the real life of actors beyond the bright lights and fame that few achieve. The audition process in which the twelve featured actors were selected for the series is a minor element in a documentary series aimed at giving the audience a

18

real "day in the life" glimpse of actors' lives. Consequently, the themes and their expression are different. There is no rejection of actors in "The Ultimate Audition" – everyone who shows up is in the film. In "The It Factor," aspiring cast members were rejected following the first episode, and even the actors cast for the series face rejection in each subsequent weekly episode.

### 2.  Setting, Plot, Sequence and Pace

There is not a single similarity of protectible plot, sequence or setting between "The Ultimate Audition" and "The It Factor." Plaintiff's film is set in a Worcester, Massachusetts prep school – "on the moon" as Plaintiff described it – where they are fed and chauffeured. Quaglia Dep. at 15 (Slotnick Decl., Ex. A). "The It Factor" is set in New York City and follows actors everywhere – on the streets, in subways, to auditions, work, in their apartments. The noise, grit and crowds of the city and its fast-paced lifestyle permeate the series.

There is no element of suspense in Plaintiff's film for the viewer, who knows from the outset that the audition is a sham. Even the actors learn their fate in a day. In sharp contrast, "The It Factor" develops from episode to episode, as the actors study, look for work and go about their lives. The suspense, shared by both the viewer and the actors, is not limited to their selection for the series, but in seeing if any of the twelve hopefuls are likely to achieve level of success during the course of the year.

The pacing and sequencing of Plaintiff's film and Bravo's series also are very different. Plaintiff's film, at 48 minutes, moves at a much slower pace than Bravo's 23-minute format for each episode. "The It Factor" covers the cattle-call and call-back auditions in 23-minutes, whereas Plaintiff's 48-minute film covers a single day.

### 3.  Total Concept and Feel

The total concept and feel of the Plaintiff's film is not similar to that of Bravo's series. The audience is in on Plaintiff's secret from the beginning. The entire process is like a long

19

"Candid Camera" episode. It is a prank or hoax perpetrated on the actors and the denouement is Plaintiff's revelation that they have all made a film together in one day.

The actors in "The It Factor" face no such resolution. Even for the fortunate twelve selected for the series, their only reward is the opportunity to go out into the world looking for work, day after day, week after week, with no assurance of success. In front of the entire viewing public, "The It Factor" documents the success for some and failure for others.

Defendants therefore are entitled to summary judgment as a matter of law for the independent reason that Plaintiff cannot raise a genuine issue of fact as to the substantial similarity of the two works.

### V. Defendants Are Entitled to Summary Judgment on Plaintiff's State Law Claims Because they are Preempted and Meritless.

Plaintiff's state law claim for breach of implied-in-fact contract simply restates his invalid copyright claim and is preempted by the Copyright Act.[5] Plaintiff's claims for breach of confidence and breach of implied-in-fact contract also fail as a matter of law because Plaintiff cannot establish the required elements of each claim.

#### A. Plaintiff's Breach of Implied-in-Fact Contract Claim is Preempted by the Copyright Act.

Plaintiff's breach of implied contract claim is preempted by § 301(a) of the Copyright Act, which preempts state or common law claims if: (1) the subject matter of the work falls within the subject matter of the copyright law; and (2) the rights asserted under state law are equivalent to the rights protected by copyright laws. *See Data General Corp. v. Grumman Sys.*

---

[5] For purposes of this motion only, Defendants will assume *arguendo* that Massachusetts law applies to the issues briefed below. In the event any of Plaintiff's claims were to survive this motion, Defendants reserve the right to argue that New York law should apply to some or all of the issues on any such claim.

*Support Corp.*, 36 F.3d 1147, 1164 (1st Cir. 1994) ("Section 301(a) precludes enforcement of any state cause of action which is equivalent in substance to a federal copyright infringement claim."). Both of these preemption elements are satisfied as to Plaintiff's breach of implied contract claim.

Plaintiff's breach of implied contract claim falls within the subject matter of federal copyright law despite Plaintiff's contention that a claim for implied contract protects his idea (Compl. ¶¶ 32-35) (Slotnick Decl., Ex. F), whereas the Copyright Act protects only the tangible expression of an idea rather than the idea itself. As courts have repeatedly held, the fact that portions of a work consist of uncopyrightable material does not take the work as a whole outside the subject matter protected by the Act. *See United States ex rel Berge v. Trustees of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997) ("ideas," which are specifically excluded from Copyright Act protection under 17 U.S.C. § 102(a), nevertheless fall within the scope of copyright subject matter and, therefore, claims based on the misappropriation of those ideas are "clearly preempted by federal copyright law.").[6] *See also Markogianis v. Burger King Corp.*, No. 95 Civ. 4627 (JFK), 1997 WL 167113, at *2 (S.D.N.Y. Apr. 8, 1997) (rejecting argument that breach of implied-in-fact contract claim was outside the subject matter of Copyright Act where plaintiff alleged his ideas had been misappropriated).

State law claims are preempted if they are not "qualitatively different" from a copyright infringement claim. *See Markogianis*, 1997 Wl 167113, at *3. To decide whether a qualitative

---

[6] *See Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985) (the scope of § 301 includes state law claims as to uncopyrightable material because otherwise "states would be free to expand the parameters of copyright protection to their own like, on the theory that preemption would not be a bar to state protection of materials not meeting federal statutory standards.").

difference exist, the court first must determine whether the state cause of action requires proof of an extra element "beyond mere copying, preparation of derivative works, performance, distribution or display." *Data General*, 36 F.3d at 1164 (citation omitted). But "[n]ot every 'extra element' of a state claim will establish a qualitative variance between the rights protected by federal copyright law and those protected by state law." *Id.* Under Massachusetts law, an action in implied-in-fact contract or quantum meruit does not bear a qualitatively different set of elements than a federal copyright claim and is thus preempted. *Tingley Sys., Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95 (D. Mass. 2001) (quantum meruit claim preempted); *Bolen v. Paragon Plastics, Inc.*, 747 F. Supp. 103, 106 (D. Mass. 1990) ("Massachusetts law treats these claims [sounding in quantum meruit, quasi-contract and implied contract] as having the same common elements.")

At their core, Plaintiff's state law claims based on nothing more than Bravo's alleged misappropriation of his copyrighted film and, thus, fall within the subject matter protected by the Copyright Act.[7] *See Fischer v. Viacom Int'l, Inc.*, 115 F. Supp. 2d 535, 540-41 (D. Md. 2000) (breach of implied-in-fact contract claim within subject matter of Copyright Act because "idea" for an animated children's program is indistinguishable from the copyrightable written proposal for describing expression of that idea). *See also Endemol Entm't B.V. v. Twentieth Television Inc.*, 48 U.S.P.Q.2d 1524 (C.D. Cal. 1998) (available at 1998 WL 785300) (breach of implied contract claim preempted where plaintiff alleged he provided copies of his work to defendant, who developed plaintiff's ideas into a television series without compensating him); *Markogianis*, 1997 WL 167113, at *5-6 (breach of implied-in-fact contract preempted where plaintiff alleged

---

[7] Notably, Plaintiff incorporates his copyright infringement allegations into his state law causes of action. (*See* Compl. ¶¶ 23, 31.)

that defendant misappropriated plaintiff's concept after providing assurances that it would be treated confidentially).

### B. Plaintiff Cannot Raise a Genuine Issue of Fact on Any Element of His State Law Claims.

There is absolutely no evidence that Defendants or anyone involved with the production of "The It Factor" copied Plaintiff's ideas. Plaintiff's breach of confidence claim also fails because Plaintiff cannot show the existence of a confidential relationship between himself and Bravo. Indeed, Plaintiff's own words – both in contemporaneous documents and in his testimony – establish the complete absence of confidentiality in his limited dealings with Bravo.

#### 1. Plaintiff's Breach of Confidence Claim Fails Because Plaintiff Did Not Have a Confidential Relationship with Bravo.

Plaintiff contends that he submitted his Film to Bravo with the understanding that his ideas were being submitted in confidence and that they would not be disclosed without his permission and compensation by Bravo. (Compl. ¶ 34.) (Slotnick Decl., Ex. F) To establish a breach of confidence claim, the plaintiff must show that the parties either stood in a relationship imposing a duty of trust or confidentiality, or that the defendants made a promise to keep the plaintiff's ideas confidential. But when an idea has already been disclosed to many others, no confidential relationship will be implied. *See J. Irizarry y Puente v. President and Fellows of Harvard College*, 248 F.2d 799 (1st Cir. 1957) (plaintiff's previous disclosure of idea to 1,500 other entities removed any implication of a confidential relationship with the defendant); *Moore v. Marty Gilman, Inc.*, 965 F. Supp. 203 (D. Mass. 1997) (a confidential relationship did not exist where plaintiff boasted about the large number of individuals familiar with his invention). The evidence here, however, indisputably shows that there was no confidential relationship between Plaintiff and Bravo:

- Plaintiff's submission of his Film to Bravo was unsolicited, made without any prior agreement with Bravo as to its confidentiality and without any request to keep the Film confidential. *Irizarry*, 248 F.2d at 802 (no confidential relationship where plaintiff's initial letter to defendant proposing his idea was gratuitous and unsolicited, even though defendant requested additional information).

- Plaintiff had only two telephone conversations with Laura Pierce – one in which he pitched his Film and the other in which she rejected his Film – and never met with anyone at Bravo in person regarding his film. (Pl.'s Answer to Interrog. No. 11.) (Slotnick Decl. Ex. G) *See Markogianis*, at *3-4 (finding no confidential relationship where parties were complete strangers to one another prior to plaintiff's submission of his educational concept, plaintiff initiated communications with defendant only after copyrighting his concept and never met with anyone from defendant during defendant's review of plaintiff's materials).

- Plaintiff admits that he had already shown his Film to over 100 people by the time he submitted his Film to Bravo, provided copies of his Film to nearly 60 people and had no confidentiality agreement with the actors or crew for his film. *See* Quaglia's 2/28/00 Letter to L. Pierce: (Slotnick Decl., Ex. F at Ex. 3) "I've shown this movie to over one hundred people...."; Pl.'s Response to Interrog. No. 10 (Slotnick Decl., Ex. G) (listing persons to whom Plaintiff provided a copy of his film; Quaglia Dep. at 34, 36-37 (Slotnick Decl., Ex. A). *See Izarry*, 248 F.2d at 802.

Plaintiff's breach of confidence claim therefore fails because Plaintiff cannot establish that he had any confidential relationship with Bravo.

2. **Plaintiff's Breach of Confidence and Breach of Implied-in-Fact Contract Claims Fail Because Bravo Did Not Misappropriate Plaintiff's Film or Ideas.**

Plaintiff's breach of confidence and breach of implied contract claims fail for the independent reason that Plaintiff cannot prove that Bravo breached any obligation it owed to Plaintiff. As previously demonstrated, Laura Pierce was the only person at Bravo who ever viewed Plaintiff's work, she never discussed it with anyone, and she returned Plaintiff's videotape to him with a rejection letter, just over one month after his submission. Bravo thus did not breach any duty to keep Plaintiff's work confidential, nor did Bravo use Plaintiff's idea without compensating him. Accordingly, Defendants' are entitled to summary judgment on Plaintiff's state law claims.

## Conclusion

For the reasons set forth herein, in the accompanying declaration of Barry I. Slotnick, the exhibits annexed thereto, and in Defendants' Rule 56.1 Statement, Defendants respectfully request that the Court grant Defendants' motion for summary judgment dismissing the Complaint with prejudice in its entirety.

Respectfully submitted,

**BRAVO COMPANY (sued as BRAVO NETWORK) and NBC UNIVERSAL, INC. (formerly known as and sued as NATIONAL BROADCASTING COMPANY, INC.)**

By their attorneys,

_____
Daniel M. Kummer (admitted *pro hac vice*)
NBC UNIVERSAL, INC.
30 Rockefeller Plaza, Rm. 1091E
New York, NY 10112
(212) 664-4017

**RAINBOW MEDIA HOLDINGS LLC (sued as RAINBOW PROGRAMMING HOLDINGS, INC.)**

By its attorneys,

_____
Barry I. Slotnick (Admitted *pro hac vice*)
Laura M. Vasey (Admitted *pro hac vice*)
**LOEB & LOEB LLP**
345 Park Avenue
New York, New York 10154
(212) 407-4000

For all Defendants:
Jonathan M. Albano, BBO #013850
Serena D. Madar, BBO # 654326
**BINGHAM MCCUTCHEN**
150 Federal Street
Boston, Massachusetts 02110
(617) 951-8000

Dated: July 21, 2005