UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------X
:
FRANK QUAGLIA,
:
        Plaintiff,
:
        -against-
        :    Civil Action No. 04-10460 RWZ

BRAVO NETWORKS, NATIONAL
BROADCASTING COMPANY, INC., doing  :
business as NBC; RAINBOW
PROGRAMMING HOLDINGS, INC., and  :
DOES 1-10,
:
        Defendants.
-----------------------------------------------------------X

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendants National Broadcasting Company, Bravo Company, sued as Bravo Networks ("Bravo"), and Rainbow Media Holdings LLC, sued as Rainbow Programming Holdings, Inc. (referred to collectively as "Defendants"), by their attorneys, respectfully submit this statement of undisputed material facts as to which there is no genuine issue to be tried.

**Plaintiff's Film, "The Ultimate Audition"**

    1.    On June 18, 1995, Plaintiff shot the video footage for his film, "The Ultimate Audition," at Worcester Academy in Worcester, Massachusetts. Quaglia Dep. at 13, 15 (Slotnick Decl., Ex. A); VHS Tape of "The Ultimate Audition" ("Pl.'s Film") (Slotnick Decl., Ex. B).

    2.    Plaintiff solicited actors to audition for his film by placing an advertisement in Back Stage, a film industry newspaper, which read, in relevant part:

> Frank Quaglia Originals is producing an independent comedic/dramatic feature film, contracted with international distributor. Seeking—Lead/supporting actors/actresses: with improvisational quick-wits to create distinct characters. Casting types (ages 18-100)—1) hilarious, 2) frustrated, 3) inspiring, 4) arrogant, 5) menacing, 6) charismatic, seductive. Percentage of movie gross profits, some initial pay. Food, transportation and lodging provided. Auditions are Sun. June 18. Audition/screen test will be straight improvisation, no script reading. Send headshots and bios to Frank Quaglia Originals …. NON-SAG PERFORMERS.

May 19, 1995 Back Stage Ad (Slotnick Decl., Ex. C). *See* Quaglia Dep. at 31-33 (Slotnick Decl., Ex. A).

3. Approximately 1,500 actors responded to Plaintiff's ad. Quaglia Dep. at 102 (Slotnick Decl., Ex. A). Based on their submissions, Plaintiff invited actors to audition for his film. *Id.* Forty actors showed up to audition, and all 40 actors appear in Plaintiff's film. *Id.*

4. Each actor who showed up to audition for Plaintiff's film signed an agreement, giving his/her consent to be filmed in return for a share of gross profits from any sale/distribution if cast in Plaintiff's film. Sample Contractual Agreement/Consent Form ("Consent Form") (Slotnick Decl., Ex. D); Quaglia Dep. at 36 (Slotnick Decl., Ex. A).

5. The Consent Form contains no assignment of copyright or other proprietary rights from the actors to Plaintiff, and no confidentiality provision. Consent Form (Slotnick Decl., Ex. D).

6. The actors who appeared in Plaintiff's film later signed a contract entitling them to a share of the gross profits from any sale or distribution of the film. Sample Contract/Agreement ("Contract") (Slotnick Decl., Ex. E). The Contract contains no assignment of copyright or other proprietary rights from the actor to Plaintiff. *Id.* The Contract also contains no confidentiality provision. *Id.*

7. Plaintiff filmed the auditions and had hidden cameras and a roving cameraman record the actors' comments and conversations. Quaglia Dep. at 22-24, 116-17, 177, 179-80 (Slotnick Decl., Ex. A). The hidden cameras enabled Plaintiff to maintain his ruse. *Id.* at 179.

8. Although the auditions appeared to be conducted by professional casting directors, in actuality, the persons conducting the auditions were not professional casting directors. Quaglia Dep. at 100-01 (Slotnick Decl., Ex. A).

9. The actors did not learn until the end of the day that their auditions, comments and conversations would become the film for which they were purportedly auditioning. Quaglia Dep. at 28 (Slotnick Decl., Ex. A).

10. Plaintiff registered a copyright in his film on September 28, 1998. Complaint ("Compl."), ¶ 13, Ex. 1 (Slotnick Decl., Ex. F).

11. Plaintiff submitted his film to 16 networks in 1999 and 2000, including Bravo. Plaintiff's Responses to Rainbow's First Set of Interrogatories ("Pl.'s Interrog. Resp."), No. 10 (Slotnick Decl., Ex. G).

12. On February 28, 2000, Plaintiff faxed a letter to Laura Pierce, then Director of Acquisitions for Bravo. 2/28/00 Letter (Compl., Ex. 3) (Slotnick Decl., Ex. F). In that letter, Plaintiff described "The Ultimate Audition" as a documentary, taped in twelve hours, with no script, and with actors who did not know they were making a movie until the end of the day. *Id.*

13. Plaintiff admits that he described his film as a documentary because documentaries were very popular at the time. Quaglia Dep. at 61-62 (Slotnick Decl., Ex. A). However, Plaintiff did not believe his film was "merely a documentary" because he did not simply observe and document the actors, but "manipulated" the situation by "instigating and initiating interactions" among the actors. *Id.* at 62, 64.

14. Plaintiff sent his film to Pierce under separate cover, which Bravo received on March 1, 2000. Quaglia Dep. at 58 (Slotnick Decl., Ex. A); Pl.'s Interrog. Resp., No. 11 (Slotnick Decl., Ex. G).

15. Plaintiff submitted his film to Bravo as a proposed licensing acquisition, not as a concept for development into a television series. See 2/28/00 Letter (Compl., Ex. 3) (Slotnick Decl., Ex. F) ("I would appreciate an opportunity to … discuss the possibility of BRAVO's buying the television rights."); Pierce Decl. ¶ 2.

16. Plaintiff's submission of his film was unsolicited by Bravo. Pierce Decl. ¶ 2.

17. By the time Plaintiff submitted his film to Bravo, he had shown it to over 100 people. 2/28/00 Letter (Compl., Ex. 3) (Slotnick Decl., Ex. F); Quaglia Dep. at 58 (Slotnick Decl., Ex. A).

18. Pierce watched only portions of Plaintiff's film, approximately four to six weeks after receiving the videotape. Pierce Decl. ¶ 3. No other Bravo personnel watched the film. Id.

19. Although there were some aspects of "The Ultimate Audition" that Pierce liked, there were more that she did not like. Pierce Decl. ¶ 4. Among other things, she did not like the trickery involved in the underlying concept for the film, in which actors were told that they were auditioning for a film project that did not actually exist. Id.

20. Pierce felt that the pacing of "The Ultimate Audition" was too slow, and that the film not engrossing or compelling enough. Pierce Decl. ¶ 4. She considered the production values and editing to be of lower quality than she would normally want to see in an acquired program. Id.

21. Pierce also thought the film would be difficult to promote, because, among other things, it had never received exposure at any film festivals, had not won any awards, and had no high profile features, such as a celebrity narrator. Pierce Decl. ¶ 4.

22. As a result of Pierce's impressions gained in screening "The Ultimate Audition," she decided that Bravo would not pursue the acquisition of Plaintiff's film. Pierce Decl. ¶ 5.

23. On March 30, 2000, Plaintiff spoke with Pierce on the telephone, and she rejected his submission. Pl.'s Interrog. Resp. No. 10 (Slotnick Decl., Ex. G).

24. By letter dated April 11, 2000, Pierce informed Plaintiff that she was not able to recommend his film for acquisition because it did not "fit [Bravo's] immediate or strategic programming needs." Pierce Decl., Ex. A. Enclosed with the letter was the videotape of Plaintiff's film. Pierce Decl. ¶ 7; Pl.'s Interrog. Resp., No. 11 (Slotnick Decl., Ex. G).

25. Pierce decided on her own (within the authority of her position) that Bravo would not seek to acquire Plaintiff's film for airing on Bravo. Pierce Decl. ¶ 5.

26. Pierce did not show or forward "The Ultimate Audition" or any portion of it to anyone else at Bravo. Pierce Decl. ¶ 5.

27. Pierce did not discuss Plaintiff's film, or any of its underlying concepts or elements, with anyone at Bravo. Pierce Decl. ¶ 5.

**The Independent Creation of "*The It Factor*" Series**

28. In the late summer of 1999, Nicole Torre, David Clair and Lauren Friedland, principals of the television production company, Zanzibar Productions (collectively, "Zanzibar"), began developing an idea for a television series about the day-to-day struggles of young actors in New York. Friedland Decl. ¶¶ 2, 4 and Ex. A; List of Documents on Clair's Hard Drive, with Date Last Modified (Slotnick Decl., Ex. H).

29. The series was roughly based on Torre's experiences as a struggling actress, who testified that she had "been wanting to do a documentary about actors for a long period of time because I've lived the life and I know what the drama is." Torre Dep. at 14 (Slotnick Decl., Ex. I). *See* Clair Dep. at 32-33 (Slotnick Decl., Ex. J).

5

30. The series had its genesis in a conversation between Torre and Clair in the late summer of 1999. *See* Friedland Decl., Ex. A. One evening they were discussing Torre's documentary idea, and Clair suggested doing a reality series about actors auditioning for a particular role, starting off with a large group of actors at the beginning and eliminating actors every episode, until you have one winner at the end. Clair Dep. at 33-34 (Slotnick Decl., Ex. J).

31. Shortly thereafter, Friedland's friend, Alice Peck, an executive of American Movie Classics ("AMC"), indicated that AMC was looking for new program ideas. Friedland Decl. ¶ 3; Clair Dep. at 35 (Slotnick Decl., Ex.J) Friedland mentioned that conversation to Clair, and he suggested the idea for a reality series that would follow young actresses auditioning for the same role. Friedland Decl. ¶ 3; Clair Dep. at 35-36, 120; Clair's Journal Notes (Slotnick Decl., Ex. K).

32. On August 25, 1999, Clair sent Friedland an e-mail with a rough outline for "The Audition," three one-hour programs giving "an in-depth ... look at ten aspiring actresses all auditioning for the same part." The viewer would "get a glimpse inside their world, get to know them," and get to experience their "excitement, frustration, elation and self[-]doubt." Friedland Decl. ¶ 4; Clair's 8/25/99 e-mail (Friedland Decl., Ex. A).

33. Zanzibar refined the proposal over the coming months. Friedland Decl. ¶ 5; Clair's 9/2/99 e-mails (Friedland Decl., Ex. B). Between October 1999 and June 2000, Zanzibar submitted roughly six different versions of the pitch – first entitled "The Audition," later "Jane X" and, ultimately, "The It Factor" – to various networks. Friedland Decl. ¶ 5.

34. "The Audition" and "Jane X" initially proposed to focus only on actresses. However, following Zanzibar's meetings with AMC, Zanzibar revised these proposals to include both actors and actresses, auditioning for the same roles. Friedland Decl. ¶ 6; "The Audition" proposals (Friedland Decl., Ex. C); "Jane X" and "Jane 6X" proposals (Friedland Decl., Ex. D).

35.     In October 1999, Zanzibar pitched a written proposal for "The Audition" to Paula Connelly and Alice Peck at AMC. Friedland Decl. ¶ 7. The written proposal described Zanzibar's concept as:

> a fast-paced 'real people' series following several actors and actresses who are all auditioning for the same roles. In a one-hour pilot and thirteen half-hour episodes, we get an up close look at the audition process, from the anonymous 'cattle call' to the birth of a star. Our goal is to take the audience past the hairstyles, big white-toothed smiles and cliches. The Audition will reveal these actors as individuals.

(Friedland Decl., Ex. C). AMC ultimately passed on the project, but referred Zanzibar to its sister channel, Bravo. Friedland Decl. ¶ 7.

36.     In December 1999, Zanzibar submitted a written proposal to Bridget Potter at Warner Bros. Television. Friedland Decl. ¶ 8; 12/21/99 letter (Friedland Decl., Ex. E); 5/11/00 e-mail (Friedland Decl., Ex. F). Potter requested a demo tape of the series, which Zanzibar was in the process of producing. Friedland Decl. ¶ 8.

37.     In December 1999, Zanzibar filmed a short demo tape of actors auditioning for a corporate video that Friedland was producing. Friedland Decl., ¶ 9; 8/28/00 e-mail (describing first audition scene as filmed at Winstar's offices in December 1999) (Friedland Decl., Ex. G). The demo tape follows actors from an audition through the days of waiting for a call back, and includes the actors' reflections on their experiences as actors. *See* Zanzibar Pitch Tape (Friedland Decl., Ex. H).

38.     Zanzibar shot additional footage and refined the demo tape over the next several months. Friedland Decl. ¶ 10. Zanzibar's Pitch Tape contains two versions of the demo for "The It Factor." The dated slates that precede each demo (March 23, 2000 and May 2000) identify the dates on which the footage was copied from a digital format to VHS tape. *Id.*

39. In March 2000, Zanzibar screened the demo tape for Potter at Warner Bros. and for Connelly and Peck at AMC. Friedland Decl. ¶ 11 & Ex. F thereto.

40. On June 27, 2000, Zanzibar submitted a written proposal and a VHS video demo for "The It Factor" to Charles Derbyshire at Bravo. *See* Friedland Decl.¶ 12; 6/27/00 letter (Friedland Decl., Ex. I); "The It Factor" proposal (Friedland Decl., Ex. J): Zanzibar Pitch Tape (Friedland Decl., Ex. H). Friedland spoke with Derbyshire sometime thereafter and he informed Friedland that he would forward the proposal and demo tape to Debbie DeMontreux. Friedland Dep. at 10-11 (Slotnick Decl., Ex. L).

41. At that time, DeMontreux was the Director of Development and Production for Bravo, responsible for reviewing third-party submissions and working with producers to develop their ideas and treatments into pilots and television series for airing on Bravo. DeMontreux Decl. ¶ 2.

42. On or about June 29, 2000, DeMontreux received a written proposal and video demo from Zanzibar Productions for "The It Factor." DeMontreux Decl. ¶ 6. "The It Factor," like "The Audition," was conceived as a documentary series exploring the professional and personal lives of actors in New York City. Friedland Decl., ¶ 13; Torre Dep. at 20-22 (Slotnick Decl., Ex. I).

43. Although DeMontreux had received similar proposals for documentary series involving auditions, such as "Divas in Training" (following opera singers) and the "Jeff Stillson Project" (following comedians on the road), she was captivated by Zanzibar's demo tape and appreciated their sympathetic treatment of actors. DeMontreux Decl. ¶ 7.

44. On August 28, 2000, DeMontreux telephoned Friedland to express Bravo's interest in developing "The It Factor" into a series. DeMontreux Decl. ¶ 8; Friedland Dec. ¶ 14.

45. On August 30, 2000, Torre, Clair and Friedland met with DeMontreux in Bravo's New York office to discuss the treatment. 8/30/00 e-mail (Friedland Decl., Ex. K). During the course of their discussion, DeMontreux suggested that Zanzibar change its treatment. DeMontreux Decl. ¶ 9.

46. Zanzibar's initial submission proposed a series in which each week actors would be eliminated from competition for a role in a film. *See* "The It Factor" proposal (Friedland Decl., Ex. J). Because Bravo was concerned that this treatment would seem like a promotion for a film, DeMontreux instead suggested more of a day-in-the-life of an actor idea, in which Zanzibar would document the lives of the actors and actresses selected for the series. DeMontreux Decl. ¶ 9; Friedland Decl. ¶ 15. *See* "The It Factor" proposal (Friedland Ex. L).

47. In December 2000, Bravo committed to developing "The It Factor" into a series. DeMontreux Decl. ¶ 11. DeMontreux was credited as the Executive Producer of the series. *Id.*

48. Zanzibar developed the following list of "cast prototypes" to be considered in selecting a cast for "The It Factor:"

- Small town actor/actress new to NYC
- Former child star/actor looking for a comeback,
- The rebel – someone who does not adhere to conventions
- The go-getter – someone who approaches acting as a business
- A bombshell/model-turned-actress
- The son/daughter/sister/brother of an actor or celebrity
- Someone with a prior criminal record
- Someone who has made extreme sacrifices in order to act
- The older actor/actress who can play teen roles
- Someone who comes from a disadvantaged background

Friedland Decl. ¶ 16 & Ex. M thereto ("Cast Prototypes" and 12/28/00 e-mail).

49. In later discussions about how to begin the series, Zanzibar decided to film the actors auditioning for the series because, in the film industry, auditioning is how an actor gets cast for a part. DeMontreux Decl. ¶ 10; Friedland Decl. ¶ 17; Torre Dep. at 26-27, 30-31, 47-48 (Slotnick Decl., Ex. I); Clair Dep. at 80-81 (Slotnick Decl., Ex. J). The auditions were run by Billy Hopkins, a well-known casting director who, with the producers, selected the actors who would star in, "The It Factor." Friedland Dec. ¶ 17.

50. Zanzibar solicited actors to audition for the series by placing an ad in the February 16, 2001 issue of Back Stage, which read:

> "THE IT FACTOR" TELEVISION SERIES
> *2/16 from 10AM-3PM at Snapper Bear Studios, 8 Bond St., NYC*
>
> A major cable network is casting for a new reality series, "The It Factor," which explores the life of an actor. Seeking interested and diverse talent, 20-35, to follow for six months. Must be willing to share their personal and professional lives on camera. Producer states: "We are looking for the needle in the haystack." Minimum pay with opportunity for national exposure. Auditions will be held Fri. Feb. 16 from 10AM-3PM at Snapper Bear Studios, 8 Bond St., NYC. Zanzibar Productions.

2/16/01 Back Stage Ad (Slotnick Decl., Ex. M); Torre Dep. at 27 (Slotnick Decl., Ex. I). Zanzibar also placed a similar ad in the Breakdown Service, which notifies agents and managers of upcoming auditions. *Id.*

51. The producers of "The It Factor" told the actors that they were auditioning for a role in a television series about actors. Torre Dep. at 50-51 (Slotnick Decl., Ex.I). At all times, the actors knew they were auditioning for a documentary or "reality" series.

52. In response to the ads, Zanzibar received approximately 1,500 submissions from agents and approximately 2,000 submissions from unrepresented actors. Episode 101 of "The It Factor" (Slotnick Decl., Ex. N).

10

53. The first episode of "The It Factor" gave the viewer an inside look at the auditioning process, from the cattle call to the callback auditions. Episode 101 of "The It Factor" (Slotnick Decl., Ex. N). During the course of a week, the casting directors – Billy Hopkins and Denise Fitzgerald – along with Torre and Friedland, interviewed hundreds of actors. *Id.* They selected 50 actors to return for callback auditions. *Id.* One week later, the callback auditions were held, with each actor presenting a monologue. *Id.* From those 50 actors, 12 were cast for "The It Factor." Episode 102 of "The It Factor" (Slotnick Decl., Ex. O).

54. The second episode of "The It Factor" begins by revealing the 12 actors who were cast for the series. Episode 102 (Slotnick Decl., Ex. O).

55. The second episode and the remaining eleven episodes of the series follow the lives of these 12 actors, as they try to make their big break. The footage is shot on location in New York City, following the actors on the streets, subways and in cabs, giving an inside look at their auditions, the jobs they work to make ends meet (e.g., one actor does stand-up comedy, another runs her own maid service) and the apartments where they live. Episodes 102 (Slotnick Decl., Ex. O); 103, 104, 105, 112 and 113 of "The It Factor" (Slotnick Decl., Exs. P-T, respectively).

56. The first two episodes of "The It Factor" premiered on Bravo on January 6, 2002. VHS Tape of "The It Factor" (Episodes 101 and 102) (Slotnick Decl., Exs. N & O); 10/15/01 e-mail from D. DeMontreux (Slotnick Decl., Ex. U).

57. Zanzibar sought to document the reality of life as an actor in New York City from a sympathetic viewpoint. Friedland Decl. ¶ 18. The producers engaged in no subterfuge or manipulation in documenting that reality. Torre Dep. at 80 ("it was a documentary so we just want[ed] to tell the truth. You don't need to orchestrate anything") (Slotnick Decl., Ex. 1). There are no hidden cameras. Torre Dep. at 41.

58.  Zanzibar's philosophy in producing "The It Factor" was not to exploit the actors. Torre Dep. at 73 ("I felt responsible for safeguarding the actors. And that was our whole approach ... we never wanted to mess with them. We wanted to just capture their lives.") (Slotnick Decl., Ex. I).

59.  Torre testified that she did not consider the concept of filming the auditioning process unique because it had already been done in shows such as Project Green Light, Pop Star Next Action Star and American Idol. Torre Dep. at 51-52 (Slotnick Decl., Ex. I).

60.  A second 13-episode season of "The It Factor," produced and filmed in Los Angeles, aired on Bravo in 2003. "The It Factor" Episodes & Air Dates Guide (Slotnick Decl., Ex. V).

**Neither Zanzibar Nor DeMontreux Had Access to Plaintiff's Film**

61.  There is no evidence that Zanzibar or Defendants actually copied Plaintiff's film.

62.  Until Plaintiff filed this suit, no member of Zanzibar – not Friedland, not Torre and not Clair – had ever heard of Frank Quaglia or his film, "The Ultimate Audition." Friedland Decl. ¶ 19; Clair Dep. at 77 (Slotnick Decl., Ex. J); Torre Dep. at 88 (Slotnick Decl., Ex. I). To date, none of them has seen his film. Friedland Decl. ¶ 19; Clair Dep. at 102; Torre at 88.

63.  During the 1999 to 2000 time period, Clair worked as a freelance editor for various production houses in Manhattan, including Northern Lights. Clair Dep. at 19-20 (Slotnick Decl., Ex. J). Through Northern Lights, Clair did some editing work for Michael Magnotta, Bravo's Director of On Air Promotion, on promotional spots for a show called "Influences." *Id.*

64.  When Friedland, Clair and Torre met with DeMontreux in August 2000, they met in Bravo's Manhattan office, not Bravo's Long Island office where Pierce worked. Friedland Decl. ¶ 15 & Ex. K.

65. No one at Zanzibar – not Friedland, not Clair and not Torre – has ever spoken with Pierce. Friedland Dep. at 51 (Slotnick Decl., Ex. L); Clair Dep. at 89 (Slotnick Decl., Ex. J); Torre Dep. at 88 (Slotnick Decl., Ex. I); Pierce Decl. ¶ 8.

66. In 1999 and 2000, Pierce was the Director of Acquisitions. Pierce Decl. ¶ 1. Her responsibilities included screening of already-produced programs that were submitted to Bravo for possible acquisition, and the development of "specials" (one-time programs or short-form series). Id.

67. DeMontreux had no involvement in or responsibilities relating to the acquisition of already-produced programs that were submitted to Bravo for possible acquisition, or the development of "specials" for airing on Bravo. DeMontreux Decl. ¶ 1.

68. From 1998 through 2002, DeMontreux was Director of Development and Production for Bravo Network. DeMontreux Decl. ¶ 1. Her responsibilities included reviewing third-party submissions and working with producers to develop their ideas and treatments into pilots and television series for airing on Bravo. Id.

69. While employed at Bravo, Pierce and DeMontreux had no professional interaction with one another beyond casual conversation. Pierce Decl. ¶ 1; DeMontreux Decl. ¶ 3; DeMontreux Dep. at 71-72 (Slotnick Decl., Ex. W).

70. DeMontreux never received a submission from Frank Quaglia concerning "The Ultimate Audition" or its development into a television series. DeMontreux Decl. ¶ 4. She maintained a log of submissions she received in 2000, and there is no entry for "The Ultimate Audition." See 2000 Submission Log (DeMontreux Decl., Ex. A). In contrast, there is an entry for "The It Factor." DeMontreux Decl., Ex. A at 13.

71.  DeMontreux had never heard of Frank Quaglia or his film, "The Ultimate Audition," nor had she ever seen his film, prior to the commencement of this action. DeMontreux Decl., Ex. 5.

72.  Pierce was not involved in the development or production of "The It Factor" series. Pierce Decl. ¶ 8; DeMontreux Decl. ¶ 13.

Dated: July 21, 2005
       New York, New York

**BRAVO COMPANY (sued as BRAVO NETWORK) and NBC UNIVERSAL, INC. (formerly known as and sued as NATIONAL BROADCASTING COMPANY, INC.)**

By their attorneys,

_____
Daniel M. Kummer (admitted *pro hac vice*)
NBC UNIVERSAL, INC.
30 Rockefeller Plaza, Rm. 1091E
New York, NY 10112
(212) 664-4017


For all Defendants:
Jonathan M. Albano, BBO #013850
Serena D. Madar, BBO # 654326
**BINGHAM MCCUTCHEN**
150 Federal Street
Boston, Massachusetts 02110
(617) 951-8000

**RAINBOW MEDIA HOLDINGS LLC (sued as RAINBOW PROGRAMMING HOLDINGS, INC.)**

By its attorneys,

_____
Barry I. Slotnick (Admitted *pro hac vice*)
Laura M. Vasey (Admitted *pro hac vice*)
**LOEB & LOEB LLP**
345 Park Avenue
New York, New York 10154
(212) 407-4000


NY429825.2
20350310009
07/21/2005 ap