UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRANK QUAGLIA,<br>        Plaintiff,<br>v.<br><br>BRAVO NETWORKS, NATIONAL<br>BROADCASTING COMPANY, INC.,<br>doing business as NBC, RAINBOW<br>PROGRAMMING HOLDINGS, INC.<br>and DOES 1-10,<br>        Defendants. | Civil Action No. 04-10460-RWZ |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Frank Quaglia, opposes the defendant's motion for summary judgment. The Defendants perpetrated all three claims of Copyright Infringement, Breach of Confidence, and Breach of Implied Contract against Frank Quaglia. The Defendants had access to The Plaintiff's movie, *The Ultimate Audition*, for six weeks (3/1/00—4/11/00). The Defendants had communications with the Plaintiff in 1999 and 2000 prior to receiving *The Ultimate Audition*, as well as during the six weeks the movie was under consideration by Bravo.

The Plaintiff's claims <u>are not</u> against David Clair, Nicole Torre, or Lauren Friedland of Zanzibar Productions; they had every right to express <u>their</u> ideas and create a television series about actors for Bravo. However, Zanzibar did not express its own ideas in *The It Factor*. Bravo's Director of Development and Production, Debbie DeMontreux clearly suppressed Zanzibar's expression of ideas. As Executive Producer of *The It Factor*, Debbie DeMontreux (<u>also a professional actress</u>) used The Plaintiff's vision and expression of ideas, and directed Zanzibar (without their knowledge) to re-create *The Ultimate Audition* as *The It Factor* premiere.

Regardless of whether Debbie DeMontreux acted alone, in conjunction with her superiors (Frances Berwick, Bravo's Senior Vice President of Programming and Vienna Steiner), or was directed (unknowingly) by one or more of her superiors, The Defendants stole 10 years of Frank Quaglia's life's work.

1

**Memorandum of Facts and Reasons to Oppose The Defendants' Motion for Summary Judgment**

**SECTION 1:** All Relevant Parties at Bravo Had Access to *The Ultimate Audition* for 6 Weeks (from the Date it Was Received 3/1/00 until the Date Returned 4/11/00)

After many telephone conversations with The Defendants in 1999 and early 2000, The Plaintiff sent a fax, a letter, and his completed, copyrighted movie, *The Ultimate Audition*, on 2/28/00 to Laura Pierce, Director of Programming for Bravo. Bravo received The Plaintiff's materials on 3/1/00 and returned them to The Plaintiff on 4/11/00 (Section 1A—typed and handwritten notes, fax, letters).

Mary Beseau was Bravo's departmental secretary, who worked directly with Frances Berwick, Debbie DeMontreux, Laura Pierce, Charles Derbyshire, and others. Submission videos were logged in and out at Mary's desk (Section 1B—Pierce Deposition, pg. 76, lns. 17-22).

Zanzibar sent *The It Factor* pitch (written and video) to Charles Derbyshire at Bravo, in hopes of contacting Laura Pierce (Section 1C— 6/27/00 letter from Friedland to Derbyshire). *The It Factor* materials were forwarded to Frances Berwick, then to Debbie DeMontreux (Section 1D—DeMontreux Deposition, pg. 17, lns.22-25, & pg. 18, lns.1-4).

At least five people at Bravo (Mary Beseau, Charles Derbyshire, Laura Pierce, Debbie DeMontreux, and Frances Berwick) had access to *The It Factor* pitch materials. The Defendants assert that *The Ultimate Audition* was in a vacuum at Bravo, in which only Laura Pierce could have seen it. Laura Pierce interacted professionally with Debbie DeMontreux (Section 1E—Pierce Deposition pg.29, lns.13-25, pg.30, lns.1-25, and pg.31, lns.1-7) not merely with "casual conversation" as The Defendants maintain (Section 1F—Defendants Statement of Undisputed Facts, pg.13, #69).

Under The Defendant's theory, a thief from any television network could steal the expression of ideas from any submission not sent directly to the thief. Plaintiffs would have to rely upon thieves, shielded by huge corporations and teams of corporate lawyers, to come forward and admit to their thefts. The Defendant's assertion in this case is not reasonable because all relevant parties at Bravo had access to *The Ultimate Audition* through the department secretary, Mary Beseau.

2

**SECTION 2:** *The It Factor*— **BEFORE  Zanzibar Met With Bravo**

David Clair, Nicole Torre, and Lauren Friedland formed Zanzibar Productions in 1999. Zanzibar developed several written pitches for television series called, *The Audition*, *Jane X*, and *The It Factor,* all which were virtually the same. Each version documented how the first show of the series would begin. *The Audition, Jane X,* and *The It Factor* pitches (Section 2A) shared a common vision and expression of ideas for the pilot/first episode entitled, This is Big Business (Excerpts below):

Find out what leads up to the first audition—get a larger perspective on casting--Famous actors and actresses talk about this segment of film production—tell us their own audition horror stories, and their secrets for getting the part—Through newsreels and archives we tell the stories of famous auditions of the past—how the casting process changed over time with the introduction of sound and the dwindling importance of the stage—Meet the director of a film that is being cast—hear him or her describe a leading role that is being cast—We hear what this director looks for in an actor and what the strategy is to find this special person—We see the script get broken down—We see large numbers of actors going through the first auditions, and realize how many hopes and dreams are at stake in the casting of these two parts. (This is how *The It Factor* was envisioned before Zanzibar met with Bravo).

**SECTION 3: The It Factor— AFTER  Zanzibar Met With Bravo**

Lauren Friedland sent a letter on 6/27/00 with *The It Factor* pitch materials to Charles Derbyshire Derbyshire, attempting to reach Laura Pierce (Section 3A). Bravo received *The It Factor* materials on 6/29/00 (Section 3B). Two months later, Debbie DeMontreux showed interest in *The It Factor* and contacted Zanzibar (Section 3C—DeMontreux Deposition pg. 41, lns. 3-17). Then, Friedland E-mailed DeMontreux before anyone at Zanzibar ever met with Bravo concerning *The It Factor* (Section 3D). Friedland's E-mail outlined a budget for six half-hour episodes (follows the casting of one female role in a feature) and twelve-hour episodes (follows the cast of female and male roles in the same feature). Zanzibar first met DeMontreux in August, 2000 according to Friedland's 9/4/00 E-mail to DeMontreux (Section 3E) which states: "…revising our proposal to reflect your comments…"

3

David Clair stated there was "big change to concept" at the first meeting with DeMontreux (Section 3F— Clair Deposition pg. 69, lns. 7-21). Clair also stated that DeMontreux changed his idea from an elimination show to a documentary series (Section 3G— Clair Deposition. pg. 60, lns. 3-13).

Zanzibar owners met with DeMontreux several times and had numerous teleconferences with her between Aug. 2000—Dec. 2000. DeMontreux sent Zanzibar a letter on 12/11/00 that outlined conditions to produce *The It Factor* series (Section 3H). DeMontreux's letter stated "...<u>Bravo will have creative approval of all elements including casting and show structure...Bravo will own all copyrights. Bravo will have sole and exclusive control over all exploitation rights, worldwide and in all media...and...retain 100% of all proceeds</u>..." Bravo's contract agreement dated 12/11/00 was signed by Zanzibar and Bravo (Section 3 I).

Watch the 1st episode of *The It Factor* (video labled 101) then refer to exhibits (Section 2A). *The Audition*, *Jane X*, and *The It Factor* shared a similar vision and expression of ideas for the pilot/1st episode entitled, <u>This is Big Business</u>. The Defendants suppressed Zanzibar's vision and expression of ideas in the 1st episode, as follows:

No famous actors talk about the casting industry, no famous actors tell audition horror stories, no famous actors tell their secrets for getting parts, no newsreels and archives tell stories of famous auditions of the past, nothing about how the casting process changed with the introduction of sound, nothing about the dwindling importance of the stage, no director was met, no film was cast, no one role (female) or two roles (one male, one female) was cast, no script was broken down—*The It Factor* <u>did not have a script or a director</u>.

The Defendants used The Plaintiff's expression of ideas, and vision, and directed Zanzibar (without their knowledge) to re-create *The Ultimate Audition* as *The It Factor* premiere.

4

**SECTION 4: Substantial Similarities Between The Ultimate Audition And The It Factor**

The Plaintiff's premise for *The Ultimate Audition* is unique: Unknown New York City actors come to an audition, hope to get roles in a future movie project, but the auditions and the auditioning process is the future movie project, and the actors are all in it. The Defendant's premise for *The It Factor* premiere mirrors the premise of *The Ultimate Audition*: Unknown New York City actors come to several auditions, hoping to get roles in a future television show, but the auditions and the auditioning process is the future television show, and many or all actors are in it. (Section 4A—Plot/Premise).

*The Ultimate Audition* has distinct character types that are focused on. *The It Factor* premiere episode focuses on twelve actors, which are strikingly similar to the actor types focused on in *The Ultimate Audition* (Section 4B-Character Matrix Analysis).

Many elements such as sequence of events, themes & symbols, text & dialogue, settings, pace, mood, music, and format are substantially similar in *The Ultimate Audition* and *The It Factor*. The Defendants already provided the court with the complete Quaglia v. Bravo Analysis (See Defendants Exhibit Y) in their Motion For Summary Judgment. (The Plaintiff and his wife spent one year assembling the 100 plus page analysis prior to filing this lawsuit.) *The Ultimate Audition* and *The It Factor* are substantially similar works.

The Defendants argue point by point, citing a myriad of cases, why the above listed elements are not copyrightable. The cases cited may have been relevant if the Zanzibar's owners had expressed their own ideas, and their vision for *The It Factor*. However, The Defendants exercised 100% creative control to make *The It Factor*. Many elements of *The Ultimate Audition* are substantially similar to elements in *The It Factor*. Elements in *The It Factor* are substantially dissimilar to elements written in Zanzibar's pitches. Therefore, all elements in *The Ultimate Audition* are copyrightable.

5

## SECTION 5:  Breach of Confidence, Breach of Implied Contract, and Copyright Infringement

The Plaintiff did not have confidentiality agreements written up for the many individuals who were shown *The Ultimate Audition* in order to assist the Plaintiff in raising money and marketing his film (Section 5A—The Plaintiff's Interrogatory, Question # 10, pgs.18-22).  The Plaintiff approached these people hoping they would help him.

The Plaintiff expected all television networks, distributors, and individuals with power and influence in the entertainment industry to keep his expressed ideas confidential.  Bravo has immense financial resources and has boasted of having 53 million viewers in 2000.  The Plaintiff obviously and reasonably expected The Defendants to keep *The Ultimate Audition* confidential.

However, The Defendants committed a Breach of Confidence against The Plaintiff.  They discussed the ideas he expressed in *The Ultimate Audition* with Zanzibar, and then directed them (without their knowledge) to re-create *The Ultimate Audition* as *The It Factor*.

Furthermore, The Defendants committed a Breach of Implied Contract against The Plaintiff.  The Plaintiff had reasonably concluded that The Defendants were not interested in purchasing his work, or giving him credit for his work, because they rejected his work.  The Defendants directed Zanzibar (without their knowledge) to re-create *The Ultimate Audition* and profited from The Plaintiffs' expressed ideas which were re-expressed in *The It Factor*.

Finally, The Defendants committed Copyright infringement against The Plaintiff.  The Defendants suppressed Zanzibar's expression of ideas for *The It Factor*, and used The Plaintiff's expression of ideas in *The Ultimate Audition* as a "hook" to get an audience excited about a new television series.

The Plaintiff's work is unique. It was the first movie ever filmed in a day, without a script, with actors who didn't know they were making a movie. *The Plaintiff studied twenty hours of documented film footage, then selected, arranged, and coordinated the fragments for four years, and created an original work of authorship* (Section 5B—10 sample pages out of hundreds of handwritten notes of film fragments). The Plaintiff's work is protected by copyright under Chapter 1 Copyright Law—101. Definitions which states in part: *A "compilation is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship* (Section 5C).

The Plaintiff intended *The Ultimate Audition* to be a television series as early as 1994 (Section 5D—*The Ultimate Audition* CBS Series Treatment). The Plaintiff had an exclusive right to prepare derivative works (a series) based on his copyrighted work, *The Ultimate Audition* (Chapter 1 Copyright Law—106). Exclusive rights in copyrighted works states in part: *the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (2) to prepare derivative works based upon the copyrighted works* (Section 5E). The Defendants abused that right when The Defendants used The Plaintiff's vision and expression of ideas, and directed Zanzibar (without their knowledge) to re-create *The Ultimate Audition* as *The It Factor's* premiere.

The Defendants stripped *The Ultimate Audition* of its value because it will be perceived as *The It Factor* copycat in the television market. Bravo aired the 26 episodes of *The It Factor* and its reruns over 400 times (Section 5F). The Defendants ruined The Plaintiff's opportunity to create a television series based upon his movie. Twenty-five episodes of *The It Factor* were based upon its premiere. *The It Factor* premiere was based upon *The Ultimate Audition*. Therefore, all twenty-six episodes of *The It Factor* were based upon *The Ultimate Audition* and all 26 episodes infringed upon The Plaintiff's copyrights.

7

## SECTION 6:  CONCLUSION

The Plaintiff had other financial opportunities to profit from *The Ultimate Audition* besides a sale to a television network. The Plaintiff had a website designed (theultimateaudition.com) and an e-commerce store was built to sell *The Ultimate Audition* for $19.99 per copy (Section 6A). The Plaintiff closed down the e-commerce store because of *The It Factor*. The Plaintiff never advertised his website store and never attempted to sell a single copy of *The Ultimate Audition*.

The Plaintiff planned a live, televised world premiere for *The Ultimate Audition* (Section 6B—2000 Marketing Plan), which may have made a footnote in film history—the first movie ever filmed in a day, without a script, with actors that didn't know they were making a movie. This black tie, multimedia event may have featured a celebrity moderator who would have interviewed the cast and crew. Then, *The Ultimate Audition* would have been watched for the first time, at the same time, by its cast and millions of television viewers. Finally, the moderator would have gotten the reactions of the cast about their experience with this unique movie, as well as updates on their own individual careers.

The Plaintiff also planned a more limited premiere at the Worcester Academy where the movie was originally filmed and videotaped (Section 6C). This premiere event would have generated excitement in the media to facilitate The Plaintiff's objective of obtaining a television/distribution contract for *The Ultimate Audition* and its subsequent television series.

The Defendants devastated The Plaintiff because of their Breach of Confidence, Breach of Implied Contract, and Copyright Infringement. The Defendants stole ten years of Frank Quaglia's work and destroyed his plans to market his movie. The Plaintiff asks The Court to rule against The Defendant's Motion For Summary Judgment and let a jury decide if The Plaintiff deserves compensation.

The Plaintiff asks Your Honor to watch his submitted video copy of *The Ultimate Audition* which is the same completed, packaged, copyrighted version Bravo received on 2/28/00. The Defendants may have inadvertently provided the court with an inferior video copy that would not accurately represent the quality of *The Ultimate Audition*.

### PLAINTIFF'S REQUEST FOR ORAL ARGUMENT

Your Honor has already scheduled a Summary Judgment Hearing for Aug. 25th, 2005 at 2:30pm.

Respectfully submitted,

*(signature)*
Frank Quaglia, Pro Se

Dated August 4, 2000