UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------ X
                                                             :
FRANK QUAGLIA,                                               :
                                                             :
        Plaintiff,                                          :
                                                             :  Civil Action No. 04-10460 RWZ
        -against-                                          :
                                                             :  **DECLARATION OF BARRY I.**
BRAVO NETWORKS, NATIONAL                                     :  **SLOTNICK IN FURTHER SUPPORT OF**
BROADCASTING COMPANY, INC., doing                            :  **DEFENDANTS' JOINT MOTION FOR**
business as NBC; RAINBOW                                         **SUMMARY JUDGMENT**
PROGRAMMING HOLDINGS, INC., and                              :
DOES 1-10,                                                   :
                                                             :
        Defendants.                                         :
------------------------------------------------------------ X

        BARRY I. SLOTNICK hereby declares, pursuant to 28 U.S.C. § 1746(2), the following:

    1. I am a member of the firm of Loeb & Loeb LLP, attorneys for Defendant Rainbow Media Holdings LLC, sued herein as Rainbow Programming Holdings, Inc. ("Rainbow"), in this matter. I respectfully submit this Declaration in further support of Defendants' Joint Motion for Summary Judgment.

    2. Attached hereto as Exhibit Z is a true and correct copy, in relevant part, of the deposition transcript of Frances Berwick, dated January 20, 2005.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       August 18, 2005

                                                            Barry I. Slotnick

NY434811.1
20350310009
08/18/2005 lv

9F00740
FRANCES BERWICK, JANUARY 20, 2005

```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS
 2   ------------------------------------------x
     FRANK QUAGLIA,
 3
                        Plaintiff,
 4
            -against-
 5
     BRAVO NETWORKS, NATIONAL BROADCASTING COMPANY,
 6   INC., doing business as NBC; RAINBOW MEDIA
     HOLDINGS, INC., and DOES 1-10
 7
                        Defendant.
 8
     ------------------------------------------x
 9

10           EXAMINATION BEFORE TRIAL of a non-party

11   witness FRANCES BERWICK, taken by Plaintiff,

12   pursuant to Subpoena, held at the Offices of NBC,

13   30 Rockefeller Center, New York, New York, on

14   January 20, 2005, at 2:45 p.m., before Christine

15   Cutrone, a Notary Public for and within the State

16   of New York.

17

18   JOB NO: 9F00740

19

20

21

22            ATKINSON-BAKER, INC.
                 National Office
23            500 N. Brand Boulevard
                  Third Floor
24           lendale, California 91203
                 (818) 551-7300
25                WWW.DEPO.COM
```

Page 1

**Atkinson-Baker, Inc. Certified Court Reporters**                          **1-800-288-3376**

**Page 6**

```
1              BERWICK
2    have no problem with that, although
3    we just like to have a clear
4    stipulation on the record that the
5    videotape is not going to be used
6    for any other purpose outside of
7    this litigation.
8        MR. JOHNSON:  I have no
9    intention of doing that.
10       MR. KUMMER:  So we have that
11   stipulation of that.
12 BY MR. JOHNSON:
13   Q.  Ms. Berwick, what do you do at Bravo?
14   A.  I head up programming and production
15 of Bravo.
16   Q.  Why don't you take me through your
17 career at Bravo.
18       When did you start there and what has
19 your title been since?
20   A.  I started in January 1996.  I was vice
21 president of programming.  And then in, I think, 1998
22 I was made senior vice president of programming and
23 production.
24   Q.  Are you British?
25   A.  Yes, I am.
```

**Page 7**

```
1              BERWICK
2    Q.  At depositions we try to get the
3  background of the individuals involved.
4        Why don't you give me your educational
5  background?
6    A.  Attending University of Edinburgh in
7  Scotland.  I have a master's in -- because that's how
8  it's done in Scotland.  I have an MA not a BA in
9  modern languages.  And then I worked in a theater
10 raising underwriting for productions for a couple of
11 years.  Then I joined channel four in London which is
12 a commercial broad cast.
13   Q.  What did you do for channel four?
14   A.  I was on the international sales.  So
15 I sold program rights overseas.
16   Q.  Why don't you take me through quickly
17 your business, you know, employment since channel
18 four?
19   A.  Then I joined -- I worked there for
20 ten years and then I joined Bravo.
21   Q.  What did you finally end up doing at
22 channel four?
23   A.  I headed up the international
24 television rights business for channel four.
25   Q.  That means that you were basically in
```

**Page 8**

```
1              BERWICK
2  sales?
3    A.  Yes.
4    Q.  You came to work for Bravo and got
5  into production and development?
6    A.  I was doing some production when I was
7  at channel four.  I was in sales which also included
8  co-productions, but, yes, that is correct.
9    Q.  Did you ever hear of The Ultimate
10 Audition?
11   A.  Not until Daniel mentioned it to me.
12   Q.  It was after this lawsuit got filed?
13   A.  Correct.
14   Q.  Prior to that point, had you ever
15 heard of a pitch that was made to Ms. Pierce relating
16 to actors who were being filmed at auditions?
17       MR. KUMMER:  Objection to form
18   and foundation.
19       THE WITNESS:  Not that I
20   recall.
21 BY MR. JOHNSON:
22   Q.  Explain how you worked with Ms. Pierce
23 when she was interested in an idea as a potential
24 acquisition?
25   A.  Laura worked -- she reported to me.
```

**Page 9**

```
1              BERWICK
2  She would review tapes that had been submitted for
3  possible acquisition.  If she thought something had
4  potential, she would then bring it to me and we would
5  discuss it.
6    Q.  And her office was adjacent to yours,
7  right?
8    A.  Yes, at one stage it was.
9    Q.  Do you have any information as to how
10 long it would take for Ms. Pierce to evaluate, say, a
11 tape that was submitted for potential acquisition,
12 was there any standard time, average time?
13   A.  I don't know that there was an average
14 time.  It depended on the volume of tapes that we
15 would be reviewing, but it could take several weeks
16 in some cases.
17   Q.  What was your involvement with The It
18 Factor?
19   A.  The It Factor was a series that we
20 produced, and it was produced after my group and one
21 of my development executives was pitched the project,
22 felt that it had merit, brought it to me and we green
23 lit it and then put it into production.
24   Q.  Well, the production executive was
25 Debbie DeMontreux?
```

**Page 30**

```
                    BERWICK
concept of following actors had come in a number of
different times and in a number of different ways.
One of those was actually a series that we went ahead
and finished production on with the Denver Center For
Performing Arts, where we followed actors going
through acting school. And that was, you know, I
believe they started production of that in what was
the graduating class of 2000. So they must have
started projection in '98. At the very minimum if
not 1997.
    Q.  Okay. Any other projects that you
could think of that were similar?
    A.  No.
    Q.  What discussions did you have with --
        MR. KUMMER: The witness wants
        to consult with me about whether
        something else is responsive to your
        answer.
        MR. JOHNSON: All right. Go
        ahead.
        (Mr. Kummer and his client
        confer with each other off the
        record.)
        THE WITNESS: So, it was --
```

**Page 31**

```
                    BERWICK
the only other thing which I hadn't
recalled until this morning when I
was shown an e-mail with another
show around the concept that had
been pitched to us, which was
pitched by somebody called Kimberly
Ricks, I believe.
        MR. KUMMER: That's in the
        production that we made.
        MR. JOHNSON: Would you read
        the answer back please.
        (The record is read back by
        the reporter.)
BY MR. JOHNSON:
    Q.  What is that concept that you are
talking about?
    A.  I don't recall the concept, but
according to the e-mail it was around the following
actors.
    Q.  That's all you could remember?
    A.  Yes.
    Q.  When did you get that submission?
    A.  It wasn't submitted to me. It was
apparently something that was raised in a verbal
```

**Page 32**

```
                    BERWICK
meeting with the then president of our network.
    Q.  What's that got to do with -- how are
you involved in that in any way?
    A.  Apparently, I then subsequently had a
telephone conversation with this person which I don't
actually remember. But --
    Q.  What was the year of the conversation?
    A.  I don't recall.
    Q.  And you can't recall anything more?
You can't recall anything about the concept; is that
right?
    A.  Just that it was about -- something to
do with actors and following, you know, actors. A
reality showing following actors.
    Q.  Have you ever seen the Ultimate
Auditions since this litigation was filed?
    A.  Yes, I've seen it since the litigation
was filed.
    Q.  Describe for me, if at all, how is the
Ultimate Audition different from the first episode of
The It Factor?
    A.  Well, the first episode of The It
Factor is us putting a casting call inviting actors
to come to an open casting audition at which tens if
```

**Page 33**

```
                    BERWICK
not hundreds of actors attend and then we go through
callbacks. And we followed some of those people as
they are getting their callbacks physically in their
homes. As they get a call saying they are getting a
call back. A simulation of what is really like to be
an actor getting a call back and then coming in for
a, you know, second audition and then us selecting a
number of them to then follow. I think there were
ten actors that we ended up following in the first
season. My understanding and I, you know, I didn't
watch the whole The Ultimate Audition in real time,
but my understanding of the film is that it was
actors invited to come in and audition for a movie
that then filmed without their knowing and told at
the end of a period of time that they have just
starred in the movie.
    Q.  You believe that the actors in The
Ultimate Audition did not know they were being
filmed?
    A.  Yes. That's my belief from a cursory
screening of it.
    Q.  What opinion do you have if any of the
similarities between The Ultimate Audition and The It
Factor, could you describe any?
```

| | BERWICK |
|---|---|
| 1 | |
| 2 | auditions are conducted, actors are customarily asked |
| 3 | to give detailed information about their personal |
| 4 | lives while in connection with the audition? |
| 5 | A.   My understanding is that they are not. |
| 6 | But we were casting for a reality series where we |
| 7 | were going to be following these people around. |
| 8 | Q.   So the answer is it's unusual; is that |
| 9 | correct. |
| 10 | A.   Depends on what you're casting for. |
| 11 | We ask a lot of personal questions when we are |
| 12 | casting for reality. I would say it's not customary |
| 13 | if you are casting for a fictional show. |
| 14 | Q.   And in connection with the auditions |
| 15 | where the actors went out to audition for The It |
| 16 | Factor, could you tell me if in any of those |
| 17 | auditions they were asked to provide detailed |
| 18 | information about their personal lives in connection |
| 19 | with the audition? |
| 20 | A.   I don't know the answer to that |
| 21 | question, because we didn't follow with our cameras |
| 22 | into every audition room. We were always granted |
| 23 | access. |
| 24 | Q.   Would you agree that the focus, the |
| 25 | underlying focus of The It Factor was the auditioning |

Page 38

| | BERWICK |
|---|---|
| 1 | |
| 2 | process? |
| 3 | A.   The underlying concept was about them |
| 4 | trying to get work. So inasmuch as if you are an |
| 5 | actor, your job interview is your audition, yes. I |
| 6 | would say that the majority of the episodes involved |
| 7 | are actors running to go on auditions. |
| 8 | Q.   What you were really doing was |
| 9 | focusing on the trials, tribulations, joys and |
| 10 | sorrows and reality of being an actor, right? |
| 11 | A.   Yes. |
| 12 | Q.   So going back again now to the pitch |
| 13 | that was made by Zanzibar to Bravo, has your |
| 14 | recollection been refreshed in any way or can you |
| 15 | provide any additional information as to how Zanzibar |
| 16 | was going to get actors that were going to |
| 17 | participate in the auditioning process? |
| 18 | A.   No. But I would assume that it was |
| 19 | what we ended up with in the first episode. |
| 20 | Q.   Well, you can't recall any back and |
| 21 | forth with any of the Zanzibar people or DeMontreux |
| 22 | as to how the auditioning process was going to be |
| 23 | conducted; is that right? |
| 24 | A.   I don't remember it specifically, no. |
| 25 | Q.   Then you no longer have any of your |

Page 39

| | BERWICK |
|---|---|
| 1 | |
| 2 | notes relating to any of the creative aspects? |
| 3 | A.   That is correct. |
| 4 | Q.   And you don't know what happened to |
| 5 | any of those notes, right? |
| 6 | A.   That is correct. |
| 7 | Q.   You have a secretary? |
| 8 | A.   Yes. |
| 9 | Q.   What is her name or what was her name |
| 10 | in the year 2000? |
| 11 | A.   Mary Beseau. |
| 12 | Q.   And Mary Beseau was also the secretary |
| 13 | for Laura Pierce during that period, right? |
| 14 | A.   Yes. |
| 15 | Q.   Would Mary and you ever talk about |
| 16 | ideas that came in as -- in other words would you run |
| 17 | by Mary ideas for projects and say: Hey, Mary, what |
| 18 | do you think about this one? |
| 19 | A.   No. |
| 20 | Q.   No? |
| 21 | A.   No. |
| 22 | Q.   Then why is that, because she had a |
| 23 | lonely position? |
| 24 | MR. KUMMER: Objection. |
| 25 | THE WITNESS: Because she |

Page 40

| | BERWICK |
|---|---|
| 1 | |
| 2 | worked for a vase number of people, |
| 3 | and we didn't have voice mail for a |
| 4 | long period of time. And she was |
| 5 | responsible for picking up about ten |
| 6 | peoples' calls. So I would |
| 7 | characterize her job primarily as |
| 8 | somebody who answered phones and |
| 9 | processed payments. |
| 10 | BY MR. JOHNSON: |
| 11 | Q.   Have you talked about this lawsuit |
| 12 | with anybody other than lawyers? |
| 13 | A.   No. |
| 14 | Q.   You never spoken to Debbie DeMontreux |
| 15 | about The Ultimate Audition; is that right? |
| 16 | A.   Not in any specific way except to |
| 17 | acknowledge that there was a litigation. |
| 18 | Q.   Have you ever had to testify in any |
| 19 | other litigation involving, you know, alleged claims |
| 20 | or claims of ideas that were inappropriate? |
| 21 | A.   No. |
| 22 | Q.   Have you ever testified in any case? |
| 23 | A.   Yes. |
| 24 | Q.   What was that about? |
| 25 | A.   One was over a partnership deal with a |

Page 41

11 (Pages 38 to 41)