UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10460-RWZ

FRANK QUAGLIA

v.

BRAVO NETWORKS, NATIONAL BROADCASTING COMPANY, INC.,
RAINBOW PROGRAMMING HOLDINGS, INC., and JOHN DOES 1-10

MEMORANDUM OF DECISION

March 21, 2006

ZOBEL, D.J.

In 1995, plaintiff Frank Quaglia placed an advertisement inviting actors to attend film auditions. Forty actors showed up at the appointed site in Worcester, Massachusetts, and over the course of a day in June 1995, they engaged in a series of auditions. The auditions were filmed, as were other informal interactions among the participants. At the end of the day, plaintiff informed the actors that they had "just made a feature film," and that there was no other film being made. (Slotnick Decl., Ex. B). Plaintiff extensively edited the raw footage, and in 1999 and 2000, pitched his film—titled "The Ultimate Audition"—to multiple networks and producers, all of whom declined to adopt the project. One of the networks to which he submitted his film was defendant Bravo Company ("Bravo"). In a letter dated April 11, 2000, Laura Pierce, Bravo's Director of Programming, informed plaintiff that his submission had been rejected. (Pierce Decl., Ex. A).

Also during 1999, a company called Zanzibar Productions ("Zanzibar") developed the idea for a television series, later known as "The It Factor," that was intended to show the day-to-day experiences of young actors in New York City. In June 2000, Zanzibar submitted a demo tape and written proposal for "The It Factor" to Bravo. In August 2000, Bravo's Director of Development and Production of Original Series, Debbie DeMontreux contacted Zanzibar and expressed interest in the proposal. "The It Factor" was eventually developed into a two-season, 26-episode series that first aired in January 2002.

In March 2004, plaintiff filed suit against defendants. The three-count complaint alleges that Bravo stole plaintiff's idea and that "The It Factor"—specifically, the "premiere episode and the first several minutes of the second episode"—is based on "the same premise and same expression of ideas" as "The Ultimate Audition." Plaintiff claims copyright infringement (Count I), breach of confidentiality (Count II), and breach of implied contract (Count III). Defendants have jointly moved for summary judgment on all counts, and plaintiff opposes.

Summary judgment may be granted when "there is no genuine issue as to any material fact," Fed. R. Civ. P. 56(c), and when no reasonable jury could find in plaintiff's favor. The evidence in the light most favorable to plaintiff and all reasonable inferences are drawn in his favor. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000). Although plaintiff's papers are read liberally, given his pro se status, they must still meet the evidentiary standard set forth

in Rule 56. See Mas Marques v. Digital Equip. Corp., 637 F.2d 24, 27 (1st Cir. 1980). The motion is allowed.

I.  Copyright Infringement

Count I of the complaint alleges copyright infringement. "A party must show two elements to prevail on a claim of copyright infringement: (1) ownership of a valid copyright and (2) copying of the protected work by the alleged infringer." Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 605 (1st Cir. 1988). As a threshold matter, it is unclear that plaintiff can prevail on the first element. Under the Copyright Act, "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). "[O]nly expression, not ideas" are protected. Eldred v. Ashcroft, 537 U.S. 186, 190 (2003). And yet, at the summary judgment hearing, plaintiff had difficulty identifying precisely what copyrightable material—other than his idea—had allegedly been stolen from him. (See Summ. J. Hearing Tr. 7-10 (arguing that Bravo took "the idea," "ended up doing the same thing," and that "the whole concept is the same")). Indeed, although plaintiff recognized that ideas are not copyrightable, he nevertheless found himself asserting that defendants had stolen his "ideas." (Id. at 7, 23). Given plaintiff's own, repeated characterization of the allegedly stolen material as an idea, it is doubtful that he could prevail on the first element of his copyright claim.

In any event, Count I fails because the undisputed record evidence shows that defendants did not copy plaintiff's work. "Copying . . . is generally established by showing that the defendant had access to the copyrighted work and that the offending and copyrighted articles are substantially similar." Concrete Mach. Co., 843 F.2d at 606. To show access, "plaintiff must produce evidence from which a reasonable finder of fact could infer that the defendant had a reasonable opportunity to copy his or her work." Id. "Evidence that only creates a bare possibility that the defendant had access is not sufficient to create a factual issue as to copying." Id. (internal quotation marks omitted). An inference of access cannot be based upon "speculation and conjecture alone." Id. (internal quotation marks omitted).

No reasonable jury could infer that defendants, and more specifically, those Bravo employees who developed "The It Factor" into a television series, had access to "The Ultimate Audition." Pierce received a copy of "The Ultimate Audition" in March 2000; she watched portions of the videotape four to six weeks later and sent a letter to plaintiff on April 11, 2000, rejecting his submission and returning the sole copy of the videotape Bravo ever possessed. (Pierce Decl. ¶¶ 3, 7). There is no evidence that Pierce showed or discussed "The Ultimate Audition" with anyone else at Bravo, and in fact she avers the opposite. (Id. ¶ 5). When Zanzibar sent materials for "The It Factor" to Bravo, it was received first by Charles Derbyshire, who then forwarded the proposal to DeMontreux. (Slotnick Decl., Ex. L, at 10-11; Friedland Eskelin Decl. ¶ 12). It was DeMontreux who followed up with Zanzibar and who ultimately worked with them to develop "The It Factor" into a television series. There is no evidence that Pierce ever

4

met with or discussed either work with DeMontreux or the principals of Zanzibar. Indeed, none of the principals of Zanzibar have ever spoken with Pierce, and the record is devoid of any evidence that DeMontreux and Pierce ever spoke about television programming generally, let alone "The It Factor" or "The Ultimate Audition" specifically. (Friedland Eskelin Decl. ¶ 19; Pierce Decl. ¶ 8; DeMontreux Decl. ¶¶ 3-5, 13).

     Plaintiff claims that access can be inferred from the fact that Mary Beseau, a secretary at Bravo, "worked directly with" DeMontreux, Pierce, and others involved in Bravo programming. (Pl.'s Opp. 2). He appears to believe that Beseau somehow acted as a conduit between Pierce and DeMontreux, arguing suggestively that "all relevant parties at Bravo had access to The Ultimate Audition through the department secretary, Mary Beseau." (Id. (emphasis in original)). Other than plaintiff's speculation, however, the record contains no proof that Beseau in fact communicated with DeMontreux or Pierce about programming, and DeMontreux avers the opposite. (DeMontreux Further Decl. ¶ 4). Frances Berwick, a programming executive at Bravo, explained that Beseau "was responsible for picking up about ten peoples' calls," and she "characterize[d] her job primarily as somebody who answered phones and processed payments." (Slotnick Further Decl., Ex. Z, at 41). The record shows only that Pierce gave Beseau the videotape submitted by plaintiff in April 2000, to return to him along with a standard form rejection letter. (Id., Ex. X, at 37-38). In the absence of any evidence suggesting that DeMontreux or others involved with "The It Factor" had access to "The Ultimate Audition," plaintiff's copyright claim fails.

Furthermore, a review of both "The Ultimate Audition" and "The It Factor" reveals that no reasonable jury could find them substantially similar beyond the level of generalized, nonprotectible ideas.  Plaintiff claims that the "premise" of the two shows is substantially similar, since both are about unknown New York City actors attending auditions, where "the auditions and the auditioning process is the future movie project" or "future television show."  (Pl.'s Opp. 5).  To the extent that both shows are about struggling actors, however, the similarity falls within the unprotected category of scenes à faire.  CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1522 n.25 (1st Cir. 1996) (noting that "similarity of expression result[ing] from stock scenes or elements that necessarily flow from a common idea" are not copyrightable).  Plaintiff's claim that defendants stole "distinct character types" from "The Ultimate Audition" likewise fails.  (Pl.'s Opp. 5 (emphasis in original)).  Character types, particularly stereotypical characters, simply do not merit copyright protection.  See Hogan v. DC Comics, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999).  Plaintiff's own comparison of the two shows reveals only that both have characters of similar age, race, gender, appearance, and general manner (e.g., "bright," "ditzy," "girl-next-door").  (Pl.'s Opp., Ex. 4B).  Such generalized character types simply are not copyrightable.

More fundamentally, plaintiff's contention that both shows take as their topic "the auditioning process" is unpersuasive.  "The Ultimate Audition" shows the auditioning process without revealing to the actors that the auditioning process itself is the only point of the audition.  As defendants note, "[i]t is a prank or hoax perpetrated on the actors and the denouement is Plaintiff's revelation that they have all made a film

6

together in one day." (Def.'s Mem. in Supp. of Joint Mot. for Summ. J. 20). The point of the auditions is subterfuge, and the point of the entire program is to create a documentary portraying unwitting participants. "The It Factor," by contrast, shows real auditions, not auditions as pranks. The point of the auditions, which is never hidden from the actors, is to select actors who will then be followed throughout the series. The focus of the show is the actors' experience of the auditions, not the creators' manipulation of the actors.

Because the undisputed record evidence shows that defendants never had access to "The Ultimate Audition," and because the two works are not substantially similar, defendants are entitled to summary judgment on Count I.

II.   State Law Claims

Counts II and III of the complaint allege breach of confidentiality and breach of implied-in-fact contract. The essence of both claims is that defendants breached their duty to plaintiff by using ideas from "The Ultimate Audition" without first obtaining his permission and without ever paying him or crediting him. (Compl. ¶¶ 27-28, 33-35). Defendants move for summary judgment on several grounds. As explained above, there is no record evidence that Bravo ever used or disclosed plaintiff's ideas or any other material from "The Ultimate Audition." Instead, the undisputed record evidence shows that (1) Pierce was the only Bravo employee to ever view "The Ultimate Audition," (2) Pierce returned the sole videotape she received to plaintiff, along with a rejection letter, without ever showing the tape to anyone else or discussing it with

anyone else, and (3) Bravo never used any of plaintiff's ideas in developing "The It Factor" or any other program. On this record, plaintiff's state law claims fail.

III.    Conclusion

Accordingly, defendants' joint motion for summary judgment (#42 on the docket) is allowed on all counts. Judgment may be entered for defendants.

_____     /s/ Rya W. Zobel
    DATE                                   RYA W. ZOBEL
                                      UNITED STATES DISTRICT JUDGE