**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE

FRANK QUAGLIA,                          )

                Plaintiff,              )

v.                                      )    Civil Action No. 04-10460-RWZ

                                        )
BRAVO NETWORKS, NATIONAL                )
BROADCASTING COMPANY, INC.,             )
doing business as NBC, RAINBOW          )
PROGRAMMING HOLDINGS, INC.              )
and DOES 1-10,                          )
                Defendants.             )

2006 APR 18  A 10: 39

U.S. DISTRICT COURT
DISTRICT OF MASS.

## **APPEAL TO:  FIRST CIRCUIT COURT OF APPEALS**

The Plaintiff, Frank Quaglia *(pro se)*, is appealing Judge Rya Zobel's March 21, 2006 Memorandum of Decision which ruled in favor of The Defendant's Joint Motion for Summary Judgment on all three counts: 1) Copyright Infringement, 2) Breach of Confidence, and 3) Breach of Implied Contract.

The Plaintiff will rely upon the same exhibits that he provided Judge Zobel: The Plaintiff's video copy of *The Ultimate Audition*, the video copy of *The It Factor's* premiere episode and its first three minutes of episode two, The Plaintiff's Opposition to Defendant's Motion for Summary Judgment with Supporting Documents, and Plaintiff's Response to Defendants' Cited Cases to Oppose Summary Judgment. In addition, he will rely upon Judge Zobel's March 21, 2006 Memorandum of Decision, and exhibits from Defendants' Joint Motion for Summary Judgment. Frank Quaglia has no legal training.

1

## BASIS OF APPEAL

### Four Critical, Genuine Issues of Material Fact were Disregarded by Judge Zobel.

1. Judge Zobel cited and relied upon the untruthful testimony of Bravo's Director of Development and Production, Debbie DeMontreux, and, as a result, reached invalid conclusions in her Memorandum of Decision. Further, Judge Zobel disregarded the testimony of Bravo's Director of Acquisitions, Laura Pierce, that contradicts DeMonteaux's untruthful testimony.

2. Judge Zobel reached an invalid conclusion regarding Bravo's infringement on Quaglia's original work of authorship that is rightfully protected by a valid copyright. The Plaintiff exhaustively edited his raw film and video footage over a period of four years to effect a compilation, which effort provided the basis for his copyright. Judge Zobel incorrectly attributes the substantial similarities between *The Ultimate Audition* and *The It Factor* to *scenes a faire,* which is unreasonable given the evidence Quaglia provided.

3. Bravo's DeMontreux copied Quaglia's protected work. Judge Zobel disregarded Quaglia's evidence that shows that Bravo's DeMontreux suppressed Zanzibar's written, expressed ideas and, instead, directed Zanzibar to unwittingly substitute Quaglia's expression of ideas from *The Ultimate Audition* for *The It Factor's* premiere episode and first three minutes of its second episode. It is the deception of DeMontreux that accounts for the substantial similarities between *The Ultimate Audition* and *The It Factor*, not *scenes a faire*.

4. Judge Zobel disregarded Quaglia's evidence that showed that Debbie DeMontreux and other Bravo employees had access to Quaglia's movie, *The Ultimate Audition,* during the six weeks that the movie was at Bravo.

2

### First Critical, Genuine Issue of Material Fact Disregarded by Judge Zobel:

Bravo's Debbie DeMontreux lied in her affidavit (See Defendant's Declaration of DeMontreux #3, Appeal Exhibit 1) in Support of Defendant's Joint Motion for Summary Judgment— where DeMontreux states: "While employed at Bravo, I had no professional interaction with Laura Pierce, then Director of Acquisitions for Bravo." (Laura Pierce was the person at Bravo to whom Quaglia sent *The Ultimate Audition.*)

In Judge Zobel's March 21, 2006 Memorandum of Decision, she cites: "Summary Judgment may be granted when 'there is no genuine issue as to any material fact,' Fed. R. Civ. P. 56(c), 'and when no reasonable jury could find in Plaintiff's favor.'" (Pg. 2, Par. 3, cont. on Pg. 3). Judge Zobel further cites: "…Indeed, none of the principals of Zanzibar have ever spoken with Pierce, and the record is devoid of any evidence that DeMontreux and Pierce ever spoke about television programming generally, let alone *The It Factor* or *The Ultimate Audition* specifically." (Pg.5, 1st Par.)

The Plaintiff provided Judge Zobel with evidence in Plaintiff's Opposition To Defendant's Motion For Summary Judgment with Supporting Documents, where he stated: "Laura Pierce interacted professionally with Debbie DeMontreux" (Appeal Exhibit 2 Pg. 2, Section 1E—Pierce Deposition pg. 29, lns. 13-25, pg. 30, lns. 1-25, and pg. 31, lns. 1-7) "not merely with 'casual conversation' as The Defendants maintain" (Appeal Exhibit 3 Pg. 2, Section 1F—Defendants Statement of Undisputed Facts. pg. 13, #69).

Pierce Deposition, pg. 29, lns. 23-25 reads as follows: "I very rarely would have anything to put fourth *(sic)* for Debbie, but occasionally Debbie might have (cont. on pg. 30, lns. 1-25) something if someone pitched her a series and she thought it really didn't have enough legs for six or twelve episodes of something and she thought it might be a good idea for a special, she

3

might then, you know, speak with me or send me over the pitch letter and the treatment and just say these people might be worth your while to meet with. I don't see a series in here. But maybe you want to meet with them for a special. BY MR. JOHNSON: Q. Did you ever have meetings with her to discuss what was going on creatively at Bravo? What you were doing in your respective offices? A. Yes, sometimes we would have programming meetings where we were both present. Q. Frances Berwick would be there? A. Yes. She was the senior VP of programming. Q. How often did you get together with Berwick and DeMontreux to go over the programming (cont. on pg. 31, lns. 1-7) issues? A. That's hard to say actually. You know it depends. I would say maybe once a month to go through, you know, things that seemed very viable. Things that were rejected, we did not spend time discussing."

The Defendants' Statement of Undisputed Facts, pg. 13, #69, restates the lie upon which Judge Zobel chose to rely: "While employed at Bravo, Pierce and DeMontreux had no professional interaction with one another beyond casual conversation." (See Appeal Exhibit 3).

Frank Quaglia sent his movie, *The Ultimate Audition*, to Laura Pierce and the movie was at Bravo for six weeks. Since Bravo's DeMontreux lied about having a professional relationship with Bravo's Laura Pierce, it is reasonable to assume that DeMontreux lied because she had access to and watched *The Ultimate Audition*, suppressed Zanzibar's written expression of ideas for *The It Factor* and instead, substituted them with Quaglia's expression of ideas. Why would Laura Pierce, co-worker and employee of Bravo, have lied about having a professional relationship with Debbie DeMontreux? It is obvious that DeMontreux lied to distance herself from her professional relationship with Laura Pierce and from the access she had to *The Ultimate Audition* through the departmental secretary, Mary Beseau. Bravo's employee access to *The Ultimate Audition* is addressed later in the Fourth Critical, Genuine Issue of Material Fact

4

Disregarded by Judge Zobel.

Rule 56 and 56(c) that Judge Zobel cited are not be applicable in this case. The Plaintiff should not be punished because Judge Zobel chose to rely upon a corrupt affidavit and false "undisputed facts" that The Defendants' attorneys submitted to her. Judge Zobel's citation of Rule 56 and the case of Mas Marques v. Digital Equip. Corp.,637 F.2d 24, 27 (1st Cir. 1980) does not apply to this case. In that case, The Plaintiff failed to provide evidence to contradict The Defendant's evidence. In Quaglia v. Bravo, The Plaintiff provided credible evidence that contradicts The Defendants' misleading and false evidence. Judge Zobel did not draw reasonable conclusions when presented with The Plaintiff's opposing evidence. Because DeMontreux lied in her affidavit, and because the lie was perpetuated in The Defendants' Statement of Undisputed Facts, all of DeMontreux's statements should have been viewed with skepticism and not relied upon as "evidence" by Judge Zobel.

The Plaintiff's Copyright Infringement Claim against Bravo, et al is valid and a reasonable jury would ultimately find in the Plaintiff's favor. This first, genuine issue of material fact negates Judge Zobel's use of Rule 56 and 56(c) to grant the defendant's joint motion for summary judgment.

**Second Critical, Genuine Issue of Material Fact Disregarded by Judge Zobel**:

The Plaintiff has ownership of a valid copyright (Effective Date of Registration with The United States Copyright Office, 9/28/98, Pau 2-335-401). Judge Zobel misunderstood The Plaintiff's position concerning his copyright claim. She adopted The Defendants' mischaracterization of Quaglia's copyright claim, and cited copyright act (17 U.S.C. 102(b) as follows (Pg.3, Par. 2, in her Memorandum of Decision): "[I]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of

5

operation, concept, principal, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

The Plaintiff stated the basis for his copyright in Plaintiff's Opposition To Defendant's Motion For Summary Judgment with Supporting Documents (Section 5, Pg. 7, Par. 1 & 2) which states: "The Plaintiff's work is unique. It was the first movie ever filmed in a day, without a script, with actors who didn't know they were making a movie. The Plaintiff studied twenty hours of documented film footage, then selected, arranged, and coordinated the fragments for four years, and created an original work of authorship (Section 5B—10 sample pages out of hundreds of handwritten notes of film fragments). The Plaintiff's work is protected by copyright under Chapter 1 Copyright Law—101. Definitions which states in part: A *"compilation is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship"* (Appeal Exhibit 4  Section 5C).

"The Plaintiff intended *The Ultimate Audition* to be a television series as early as 1994 (Section 5D—*The Ultimate Audition,* CBS Series Treatment). The Plaintiff had an exclusive right to prepare derivative works (a series) based on his copyrighted work, *The Ultimate Audition* (Chapter 1 Copyright Law—106). Exclusive rights in copyrighted works states in part: *the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (2) to prepare derivative works based upon the copyrighted works* (Appeal Exhibit 5 Section 5E). The Defendants abused that right when The Defendants used The Plaintiff's vision and expression of ideas, and directed Zanzibar (without its knowledge) to re-create *The Ultimate Audition* as *The It Factor's* premiere."

The Defendants deprived Quaglia of the realistic opportunity to sell *The Ultimate*

6

*Audition* and to develop a series from that movie because it would be perceived as a copycat of *The It Factor*. *The It Factor* was shown to millions of Bravo viewers, over four hundred times, counting reruns, over a two year period. The fact that Bravo suppressed Zanzibar's written, expressed ideas, and, instead, used Quaglia's expression of ideas eluded Judge Zobel's analysis, as the Plaintiff demonstrates in the following critical, genuine issue of material fact disregarded by Judge Zobel.

### Third Critical, Genuine Issue of Material Fact Disregarded by Judge Zobel:

Bravo's DeMontreux copied The Plaintiff's protected work. Judge Zobel states in her Memorandum of Decision (pg. 4, 1st par.): "In any event, Count 1 fails because the undisputed record evidence shows defendants did not copy plaintiff's work." Quaglia provided Judge Zobel with clear evidence that Zanzibar's initial pitch for the premiere episode of *The It Factor* did not even remotely resemble what *The It Factor* premiere episode became after Bravo's influence. As shown below, The Plaintiff provided Judge Zobel with substantial and substantive evidence to clearly show that Bravo suppressed Zanzibar's written, ideas and, instead, expressed Quaglia's ideas in *The It Factor*.

The following are portions of Plaintiff's Opposition To Defendants' Motion For Summary Judgment with Supporting Documents that were submitted to Judge Zobel (Pgs. 3 and 4):

*THE IT FACTOR* BEFORE ZANZIBAR MET WITH BRAVO

Zanzibar developed several written pitches for a television series, all of which were virtually the same. Each version documented how the first show of the series, to be called *This Is Big Business*, would begin. *The Audition*, *Jane X*, and *The It Factor* pitches (Appeal Exhibit 6 Section 2A) shared a common vision and expression of ideas, as shown by the excerpts below:

7

Find out what leads up to the first audition—get a larger perspective on casting—Famous actors and actresses talk about this segment of film production—tell us their own audition horror stories, and their secrets for getting the part—Through newsreels and archives we tell the stories of famous auditions of the past—how the casting process changed over time with the introduction of sound and the dwindling importance of the stage—Meet the director of a film that is being cast—hear him or her describe a leading role that is being cast—We hear what this director looks for in an actor and what the strategy is to find this special person—We see the script get broken down—We see large numbers of actors going through the first auditions, and realize how many hopes and dreams are at stake in the casting of these two parts.

The excerpts above reflect how *The It Factor* was envisioned by Zanzibar before it met with Bravo. The Plaintiff requests that the Appeals Judge watch the video of the premiere episode of *The It Factor* and compare it with Zanzibar's written, expressed ideas for the first episode of *The It Factor* before Zanzibar met with DeMontreux.

## *THE IT FACTOR* <u>AFTER</u> ZANZIBAR MET WITH BRAVO

*No* famous actors talk about the casting industry. *No* famous actors tell audition horror stories. *No* famous actors tell their secrets for getting parts. *No* newsreels and archives are used to tell stories of famous auditions of the past. There is *nothing* about how the casting process changed with the introduction of sound and *nothing* about the dwindling importance of the stage. *No* director was met. *No* film was cast. *No* one role (female) or two roles (one male, one female) were cast. *No* script was broken down. *The It Factor* premiere episode did not even have a script or a director, after DeMontreux's impact.

Zanzibar first met DeMontreux in August, 2000, according to Zanzibar's Lauren Friedland's 9/4/00 E-mail to DeMontreux (<u>Appeal Exhibit 7</u> Section 3E), which states, in part:

8

"We have been revising our proposal to reflect your comments from last week's meeting and focus on Bravo's objectives."

Zanzibar's David Clair stated, in part, that DeMontreux initiated a "big change to concept" at that first meeting (Appeal Exhibit 8 Section 3F— Clair Deposition pg. 69, lns. 7-21). Clair also said DeMontreux changed Zanzibar's idea from an elimination show to a documentary series (Appeal Exhibit 9 Section 3G—Clair Deposition. pg. 60, lns. 3-13).

Zanzibar owners met with DeMontreux several times and had numerous teleconferences with her between Aug. 2000—Dec. 2000. DeMontreux sent Zanzibar a letter on 12/11/00 that outlined conditions to produce *The It Factor* series (Appeal Exhibit 10 Section 3H). DeMontreux's letter stated: "...Bravo will have creative approval of all elements including casting and show structure...Bravo will own all copyrights. Bravo will have sole and exclusive control over all exploitation rights, worldwide and in all media...and...retain 100% of all proceeds..." Bravo's contract agreement dated 12/11/00 was signed by Zanzibar and Bravo (Appeal Exhibit 11 Section 3 I).

Conversely, Quaglia's approach to expressing the actors' struggles was uniquely his own. His movie, *The Ultimate Audition*, was the first movie ever to audition actors for a future project, and to have the auditions and the auditioning process itself actually be the future project. Bravo's *The It Factor* was the second. While The Plaintiff does not assert that he can copyright "his idea", "method of operation", or unique "concept", he does assert that Bravo's use of his unique idea, concept, and method further demonstrates that Bravo's DeMontreux had access to, watched, and re-created *The Ultimate Audition*. The similarities between *The Ultimate Audition* and *The It Factor* are so substantial they cannot reasonably be ascribed to *scenes a faire*.

Judge Zobel asserts (Memorandum of Decision, pg. 6, 1st par., 6th ln.): "…To the extent that both shows are about struggling actors, however, the similarity falls within the unprotected category of *scenes a faire*. CMM Cable Rep., inc. v. Ocean Coast Props., inc., 97 F.3d 1504, 1522 n.25 (1st Cir. 1996). (noting that 'similarity of expression result[ing] from stock scenes or elements that necessarily flow from a common idea' are not copyrightable)."

The Plaintiff has demonstrated that the "similarity of expression" between *The Ultimate Audition* and *The It Factor* DO NOT STEM "from stock scenes or elements that necessarily flow from a common idea". The Plaintiff had his set of ideas that he expressed to make *The Ultimate Audition*. Zanzibar had it's written, expressed ideas on how to make the first episode of *The It Factor*. Bravo's DeMontreux suppressed Zanzibar's written, expressed ideas and replaced them with Quaglia's expression of ideas. Therefore, the similarities do not fall within the unprotected category of *scenes a faire*.

The Plaintiff requests that the Appeals Judge please review Appeal Exhibit 6 Section 2A Zanzibar's written, expressed ideas in their pitch for *The It Factor's* 1st show, and note that Bravo's DeMontreux suppressed Zanzibar's written expressed ideas and, instead, used Quaglia's unique expression of ideas, as follows:

- Characters: DeMontreux suppressed Zanibar's idea to follow the casting of one female or, alternatively, one female and one male lead for *The It Factor* (Appeal Exhibit 14), in favor of emulating Quaglia's distinctive, multicultural ensemble cast of *The Ultimate Audition* and also featuring specific character types, as Quaglia did (Appeal Exhibit 12).

- Plot: Zanzibar had intended *The It Factor* to be an elimination show (Appeal Exhibit 9). DeMontreux suppressed Zanzibar's expression of idea of an elimination show, in favor of emulating Quaglia's unique expression of idea. Zanzibar had not imagined having the

10

actors' initial auditions for a future show, including their interviews with casting directors and commentary to roving camerapeople about the challenges they face in their daily lives, to actually be the plot for *The It Factor's* premiere episode, but that was precisely how Quaglia had expressed the idea of the actor's life in *The Ultimate Audition* (Appeal Exhibit 13 Section 4A). Quaglia's expression of that idea was unique because *The Ultimate Audition,* copyrighted in 1999, was the first movie in history to have expressed it in that way.

- Dialogue: Zanzibar had intended *The It Factor's* premiere episode to have a script (Appeal Exhibit 6). DeMontreux scrapped that idea in favor of *The Ultimate Audition's* unscripted approach. (See *The Ultimate Audition* movie).

In addition to those listed above, Bravo, which had 100% creative control of *The It Factor,* emulated Quaglia's use of the following elements in his expression of ideas for *The Ultimate Audition:*

- Sequence of Events: This element answers the question: What do the characters/actors do? It clarifies when the actors make entrances, exits, and announcements; when they are introduced, prompted, interviewed, and auditioned; when they converse with roving cameraperson(s) and interact with each other; when they travel to and from auditions and, especially, when they wait before and after their auditions. Bravo's sequence of events in *The It Factor* is overwhelming similar to Quaglia's in *The Ultimate Audition.* DeMontreux suppressed whatever *The It Factor's* sequence of events might have been, had Zanzibar been allowed to pursue it's expression of ideas for its elimination show.

- Settings: Both *The Ultimate Audition* and *The It Factor* employ the same settings: audition rooms and the spaces adjacent to them, inside and out – waiting rooms,

hallways, and streets. The sets in both shows progressed from larger spaces accommodating many actors to different, usually smaller, spaces where fewer numbers of actors waited, to isolated audition rooms for individual auditions, and then back to the various waiting areas, inside and out.

*   Pace: The pace of both *The Ultimate Audition* and *The It Factor* is generally very fast, stressing the frenetic pace of New York actors' lives. Both works feature quick editing cuts back and forth between auditions, interviews, and commentary.

*   Mood: The mood projected by the actors in *The Ultimate Audition* and *The It Factor* is the same: alternately upbeat (positive, hopeful, determined, enthusiastic, energized, exhilarated) and anxious (time-stressed, nervous, jittery, frustrated, and fearful of rejection and failure).

*   Music: The music Bravo ultimately used in *The It Factor* is, once again, remarkably similar to Quaglia's in *The Ultimate Audition*, in that both feature original composition using few instruments to send a message that effectively underscores a mood, and the music of both sound similar. The music Zanzibar originally used in its pitch video for *The It Factor* was very different and did not sound like Quaglia's.

The Plaintiff maintains that DeMontreux used Quaglia's expressed ideas from his movie, *The Ultimate Audition* and re-used them for *The It Factor*. DeMontreux had multiple meetings from August through December 2000, in person and through teleconferences, with Zanzibar before she offered them a contract (Appeal Exhibit 14 Section 3D, Appeal Exhibit 7 Section 3E, Appeal Exhibit 8 Section 3 F, Appeal Exhibit 9 Section 3G). DeMontreux ate away at Zanzibar's written, expressed ideas for *The It Factor* show, and replaced them with Quaglia's

12

expression of ideas. Zanzibar was eager to produce their first television show ever. Zanzibar

never knew that the expressed ideas that Debbie DeMontreux spoon-fed them for months came

from *The Ultimate Audition.*

Judge Zobel cites in her Memorandum of Decision (Pg. 7, 3rd Par.): "…there is no record

evidence that Bravo ever used or disclosed plaintiff's ideas or any other material from 'The

Ultimate Audition.' Instead, the undisputed record evidence shows that (1) Pierce was the only

Bravo employee to ever View 'The Ultimate Audition,' (2) Pierce returned the sole videotape

she received to plaintiff, along with a rejection letter, without ever showing the tape to anyone

else or discussing it with anyone else, and (3) Bravo never used any of plaintiff's ideas in

developing 'The It Factor' or any other program. On this record, plaintiff's state law claims

fail."

Bravo's DeMontreux's suppression of Zanzibar's written, expressed ideas for *The It

Factor* and her substitution of Quaglia's expression of ideas in *The Ultimate Audition* escaped

Judge Zobel's analysis. Bravo didn't get the ideas and how to express them from Zanzibar.

DeMontreux got the ideas and how to express them from *The Ultimate Audition.* Bravo's

DeMontreux had access to *The Ultimate Audition* during the six weeks the movie was at Bravo,

as The Plaintiff shows in the following critical, genuine issue of material fact disregarded by

Judge Zobel.

## Fourth Critical, Genuine Issue of Material Fact Disregarded by Judge Zobel:

Bravo's DeMontreux had access to and watched *The Ultimate Audition* during the six

weeks that the movie was at Bravo. In her Memorandum of Decision, Judge Zobel stated: "To

show access, 'plaintiff must produce evidence from which a reasonable finder of fact could infer

that the defendant had a reasonable opportunity to copy his or her work.'" (Pg. 4, 1st Par.). She

13

also stated: "No reasonable jury could infer that defendants, and more specifically, those Bravo employees who developed *The It Factor* into a television series, had access to *The Ultimate Audition*." (Pg. 4, 2nd Par.).

The Plaintiff provided Judge Zobel with evidence to show that Debbie DeMontreux and other Bravo employees had access to *The Ultimate Audition.* The Defendants acknowledge that *The Ultimate Audition* was under review at Bravo for six weeks (Pg. 1 of Judge Zobel's Memorandum of Decision). In Plaintiff's Opposition To Defendant's Motion For Summary Judgment, The Plaintiff provided Bravo's Laura Pierce's Deposition evidence, (Appeal Exhibit 15 Section 1B Pg. 76, lns. 17-22) in which Pierce responds as follows: "Q: When tapes were there to be screened, were they logged in in some way? A: Yes. Q: There would be a log chart? A. That was a Mary task. She would log them in and log them out. Q: Where are those logs today, do you know? A. I don't know. I have no idea."

That submission log reflecting the distribution of *The Ultimate Audition* to the individuals who screened it during those six weeks has never been produced by the defendants.

Judge Zobel disregarded the evidence that Mary Beseau, Bravo's departmental secretary, logged submission videos in and out for Bravo employees to screen. *The Ultimate Audition* was one of those videos submitted that would have been logged in and out by Beseau. As Beseau logged videos in and out for Bravo employees to screen, as Pierce states in her deposition, then of course Beseau had access to and the opportunity to watch and share *The Ultimate Audition.* However, Judge Zobel states in her Memorandum of Decision under State Law Claims: "…Instead, the undisputed record evidence shows that (1) Pierce was the only Bravo

14

employee to ever view *The Ultimate Audition*..." Judge Zobel's use of the word "undisputed" in not reasonable, since it's been shown that DeMontreux lied about having a professional relationship with Bravo's Laura Pierce to distance herself from her access to *The Ultimate Audition*. Also, the submission log in question was never produced by The Defendants to show which employees at Bravo screened Quaglia's movie and how many times, as it was logged in and out. Laura Pierce's testimony that she personally didn't show *The Ultimate Audition* to anyone may be true, but irrelevant. As departmental secretary, Beseau had direct access to *The Ultimate Audition* and could have watched it and shared it with any employee at Bravo. In Judge Zobel's Memorandum of Decision she states: "Plaintiff claims that access can be inferred from the fact that Mary Beseau, a secretary at Bravo, 'worked directly with' DeMontreux, Pierce, and others involved in Bravo programming...Other than plaintiff's speculation, however, the record contains no proof that Beseau in fact communicated with DeMontreux or Pierce about programming, and DeMontreux avers the opposite." (Pg. 5, 2nd & 3rd Par). Judge Zobel's analysis is off-point. As one function of her position as departmental secretary working with those involved in Bravo's programming, Beseau was required to log videos in and out for Bravo employees. Beseau did not *need* to have "communicated with DeMontreux or Pierce about programming..." to provide direct access to Bravo employees who screened submission videos that she logged in and out, such as *The Ultimate Audition*. As Pierce stated in one of her deposition remarks above, "That was a Mary task." Mary was *the conduit* to the screening of video submissions for the programming staff at Bravo.

The Plaintiff provided Judge Zobel with numerous supporting documents in Plaintiff's Opposition To Defendants Motion For Summary Judgment, which connected the dots to show that many Bravo employees had access to *The Ultimate Audition*. It is unreasonable to conclude

15

that *The Ultimate Audition* was in a vacuum at Bravo, while *The It Factor* pitch papers and video

were in the hands of so many Bravo employees: Mary Beseau, Charles Derbyshire, Laura Pierce,

Debbie DeMontreux, and Frances Berwick (Appeal Exhibits 17 and 18). Judge Zobel

disregarded much of this evidence. Judge Zobel states in her Memorandum of Decision (Pg. 4,

1st Par.): "Evidence that only creates a bare possibility that the defendant had access is not

sufficient to create a factual issue as to copying." The Following is Pg. 2 of Plaintiff's

Opposition To Defendants' Motion For Summary Judgment with Supporting Documents (with

Appeal Exhibits added) concerning Bravo employees' access to *The Ultimate Audition*:

**"Memorandum of Facts and Reasons to Oppose The Defendants' Motion for Summary**

**Judgment SECTION 1:** All Relevant Parties at Bravo Had Access to *The Ultimate Audition*

for 6 Weeks (from the Date it Was Received 3/1/00 until the Date Returned 4/11/00)"

"After many telephone conversations with The Defendants in 1999 and early 2000, The

Plaintiff sent a fax, a letter, and his completed, copyrighted movie, *The Ultimate Audition*, on

2/28/00 to Laura Pierce, Director of Programming for Bravo. Bravo received The Plaintiff's

materials on 3/1/00 and returned them to The Plaintiff on 4/11/00 (Appeal Exhibit 16 Section

1A—typed and handwritten notes, fax, letters)."

"Mary Beseau was Bravo's departmental secretary, who worked directly with Frances

Berwick, Debbie DeMontreux, Laura Pierce, Charles Derbyshire, and others. Submission videos

were logged in and out at Mary's desk (See Appeal Exhibit 15 Section 1B—Pierce Deposition,

pg. 76, lns. 17-22)."

"Zanzibar sent *The It Factor* pitch (written and video) to Charles Derbyshire at Bravo, in hopes of contacting Laura Pierce (Appeal Exhibit 17 Section 1C— 6/27/00 letter from Friedland to Derbyshire). *The It Factor* materials were forwarded to Frances Berwick, then to Debbie DeMontreux (Appeal Exhibit 18 Section1D—DeMontreux Deposition, pg. 17, lns.22-25, & pg. 18, lns.1-4)."

"At least five people at Bravo (Mary Beseau, Charles Derbyshire, Laura Pierce, Debbie DeMontreux, and Frances Berwick) had access to *The It Factor* pitch materials. The Defendants assert that *The Ultimate Audition* was in a vacuum at Bravo, in which only Laura Pierce could have seen it. Laura Pierce interacted professionally with Debbie DeMontreux (See Appeal Exhibit 2 Section 1E—Pierce Deposition pg.29, lns.13-25, pg.30, lns.1-25, and pg.31, lns.1-7) not merely with 'casual conversation' as The Defendants maintain (See Appeal Exhibit 3 Section 1F—Defendants Statement of Undisputed Facts, pg.13, #69)."

"Under The Defendants' theory, a thief from any television network could steal the expression of ideas from any submission not sent directly to the thief. Plaintiffs would have to rely upon thieves, shielded by huge corporations and teams of corporate lawyers, to come forward and admit to their thefts. The Defendant's assertion in this case is not reasonable because all relevant parties at Bravo had access to *The Ultimate Audition* through the department secretary, Mary Beseau."

"The Plaintiff has established in the First Critical, Genuine Issue of Material Fact Disregarded by Judge Zobel that DeMontreux lied in her affidavit about having a professional relationship with Laura Pierce. DeMontreux lied in her affidavit to cover up the fact that she had access to and watched *The Ultimate Audition*."

17

Judge Zobel asserts that the similarities between *The Ultimate Audition* and *The It Factor* result from *scenes a faire*. The Plaintiff's novel, unique vision and expression of ideas in *The Ultimate Audition* did not suddenly and mysteriously pop into DeMontreux's brain shortly after *The Ultimate Audition* had been at Bravo for six weeks. She had access.

The most compelling evidence of that access was shown in The Plaintiff's Third Critical, Genuine Issue of Material Fact Disregarded by Judge Zobel. That DeMontreux scrapped Zanzibar's written, expressed ideas in favor of Quaglia's expression of ideas goes to the heart of why Judge Zobel's denial of The Plaintiff's Copyright Infringement, Breach of Confidence, and Breach of Implied Contract claims is so unreasonable.

## CONCLUSION

1.   In the First Critical, Genuine Issue of Material Fact Disregarded by Judge Zobel, The Plaintiff showed that Bravo's DeMontreux lied about having a professional relationship with Bravo's Laura Pierce. DeMontreux lied in her affidavit to cover up the fact that she had access to and watched *The Ultimate Audition* and because she wanted to distance herself from Quaglia's expression of ideas in *The Ultimate Audition*, which she substituted for Zanzibar's written, expressed ideas in *The It Factor's* premiere episode and first three minutes of its second episode. Judge Zobel disregarded the contradictory evidence of Bravo's Laura Pierce, who stated in her deposition that she did, in fact, have a professional relationship with DeMontreux. There is no reasonable explanation for Pierce's having lied about the nature of her relationship with DeMontreux, which she elaborated upon in some detail. Because DeMontreux lied in her affidavit, all of DeMontreux's statements should have been viewed with skepticism and not relied upon as "evidence" by Judge Zobel.

18

2.   In the Second Critical, Genuine Issue of Material Fact Disregarded by Judge Zobel,

Quaglia showed that he *created an original work of authorship* and that his work is protected by

copyright under Chapter 1 Copyright Law—101. The Plaintiff had an exclusive right to prepare

derivative works (such as the series he had envisioned for *The Ultimate Audition* since 1994)

based on his copyrighted work, *The Ultimate Audition* (Chapter 1 Copyright Law—106). The

Defendants violated both copyright laws above when Bravo's DeMontreux directed Zanzibar

(without its knowledge) to use Quaglia's unique expression of ideas from *The Ultimate Audition*

for *The It Factor's* premiere episode and first three minutes of its second episode. The Plaintiff

studied twenty hours of his own documentary film and video footage, then selected, arranged,

and coordinated the fragments for four years, and created an original work of authorship—a

compilation. The Defendants deprived Quaglia of a realistic opportunity not only to sell *The*

*Ultimate Audition,* but also to develop a derivative series from his movie because it would be

perceived as a copycat of *The It Factor*. *The It Factor* was shown to millions of Bravo viewers,

over four hundred times, including reruns, over a two year period.

3.   In the Third Critical, Genuine Issue of Material Fact Disregarded by Judge Zobel, The

Plaintiff exhaustively demonstrated that the "similarity of expression" between *The Ultimate*

*Audition* and *The It Factor* DOES NOT STEM "from stock scenes or elements that necessarily

flow from a common idea," or *scenes a faire.*   The Plaintiff had his own set of ideas that he

expressed in *The Ultimate Audition,* featuring a multicultural ensemble cast, specific character

types, an unscripted format, a novel plot, a planned sequence of events, overriding themes and

symbols, improvisational dialogue, specific settings, a fast pace, and varying moods underscored

by evocative, original music. Zanzibar had its own written expressed ideas on how to make the

first episode of *The It Factor* before it met with Bravo's DeMontreux. Referencing the

19

deposition testimony and E-mail evidence of Zanzibar's David Clair and Lauren Friedland, and the evidence of Zanzibar's written, expressed pitch materials for *The It Factor's* premiere episode, as well as DeMontreux's letter of intent to Zanzibar and Bravo's subsequent contract with Zanzibar stressing Bravo's total creative control and ownership of *The It Factor's* copyright, Quaglia demonstrated that DeMontreux suppressed Zanzibar's ideas and replaced them with his own, as expressed in *The Ultimate Audition*. Zanzibar never knew DeMontreux was spoon-feeding them Quaglia's expression of ideas. That DeMontreux scrapped Zanzibar's written, expressed ideas, appropriated Quaglia's expression of ideas, and directed Zanzibar to re-create them is the most critical of all the facts that escaped Judge Zobel's analysis.

4.   In the Fourth Critical, Genuine Issue of Material Fact Disregarded by Judge Zobel, *via* the deposition testimony of Bravo's Laura Pierce, The Plaintiff showed how Bravo's DeMontreux had access to *The Ultimate Audition* through Mary Beseau, the departmental secretary whose function it was to log submission videos in and out for screening purposes for Bravo staff. Judge Zobel disregarded the evidence that virtually any Bravo employee had access to video submissions *via* Beseau . (Unfortunately, The Plaintiff never had an opportunity to depose Beseau who, according to The Defendants' attorneys, had suffered a severe stroke. Her testimony may have been enlightening.) Quaglia clarified how he reached the unavoidable conclusion that DeMontreux had viewed *The Ultimate Audition* during the six weeks that it remained for acquisition evaluation at Bravo. Given the overwhelming disparity between Quaglia's movie and the original pitch materials Zanzibar sent to Bravo and the overwhelming similarities between *The Ultimate Audition* and the final, televised version of *The It Factor*, a reasonable jury would conclude that Bravo's DeMontreux had had access to *The Ultimate*

20

*Audition.* This view is also supported by Friedland's and Clair's comments above concerning the "big changes" DeMontreux made to their project.

In addition to evidence presented in the Four Critical, Genuine Issues of Material Fact Disregarded by Judge Zobel, Quaglia expected all television networks, distributors, and individuals with power and influence in the entertainment industry to keep his expressed ideas confidential. Bravo has immense financial resources and, in 2000, boasted of having 53 million viewers. Quaglia obviously and reasonably expected The Defendants to keep *The Ultimate Audition* confidential.

However, The Defendants committed a Breach of Confidence against The Plaintiff. DeMontreux discussed the ideas Quaglia expressed in *The Ultimate Audition* with Zanzibar, and then directed Zanzibar (albeit, unwittingly) to re-create *The Ultimate Audition* as *The It Factor*.

Furthermore, The Defendants committed a Breach of Implied Contract against Quaglia, who had reasonably concluded that The Defendants were not interested in purchasing his work, or giving him credit for his work, because they rejected his work. The Defendants profited from Quaglia's uniquely expressed ideas when DeMontreux directed Zanzibar, without its knowledge, to re-create *The Ultimate Audition* as *The It Factor.*

Concerning The Plaintiff's *(pro se)* evidence in this case, Judge Zobel did *not* view "*the evidence in the light most favorable to plaintiff*" and did *not* draw "*all inferences…in his favor.*" The Plaintiff provided Judge Zobel with credible evidence to contradict The Defendant's false evidence, but Judge Zobel chose to rely upon the latter. Judge Zobel's use of Rules 56 and 56C to rule in favor of The Defendant's Joint Motion for Summary Judgment was unjustified, as was her analysis of why *The Ultimate Audition* and *The It Factor* had so many substantial similarities.

21

Judge Zobel adopted The Defendants' mischaracterization of *The Ultimate Audition* when she stated: "The point of the auditions is subterfuge, and the point of the entire program is to create a documentary portraying unwitting participants." Again, Judge Zobel's analysis missed the mark. Although Quaglia's actors initially did not know they were making a movie at the time of their auditions, they all had agreed to allow their auditions to be filmed and, once they learned that the audition day itself was the movie, they again had the option to be included in the movie or not. All but one of the actors opted to be part of the movie, and the one who did not sign a contract had union issues. The point of *The Ultimate Audition* was not to perpetrate a "hoax" or a "subterfuge." Quaglia's point was to create a funny, dramatic, compelling movie about the lives of actors and, in the process, hopefully launch some careers, including his own.

The Plaintiff's claims of Copyright Infringement, Breach of Confidence, and Breach of Implied Contract are all valid. The Defendants stole many years of Frank Quaglia's work. He has exceeded the requirements to obtain a trial by jury to decide this matter on all three claims.

The Plaintiff requests that the First Circuit Court of Appeals overturn Judge Zobel's unsubstantiated ruling and rule against The Defendant's Motion For Summary Judgment on all three claims.

Respectfully submitted,

*Frank Quaglia*

Frank Quaglia, *(Pro Se)*

April 18, 2006

22