UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRANK QUAGLIA, )
 )
       Plaintiff, )
 )
   v. ) Civil Action No. 04-10460-RWZ
 )
BRAVO NETWORKS, NATIONAL )
BROADCASTING COMPANY, INC., )
doing business as NBC, RAINBOW )
PROGRAMMING HOLDINGS, INC. )
and DOES 1-10, )
 )
       Defendants. )

**The Plaintiff's Opposition to Defendant's Joint Motion for Attorneys' Fees and Costs**

I, Frank Quaglia *(pro se)*, am 44 years old. I have never sued any person or entity for money prior to this case. I have no legal training. For the past several years, I have earned approximately $30,000 per year. I was laid off from my job in December, 2005 and have received $405 per week unemployment insurance income since, which is about to expire. I have been actively seeking, but have not yet found, new employment. I am married and have three minor children, ages twelve, fourteen, and seventeen, who live with me. My wife is disabled.

My wife and I worked for one year on the Quaglia v. Bravo written analysis, after Bravo first aired *The It Factor* on January 6, 2002. After having reviewed that analysis and having watched *The Ultimate Audition* and *The It Factor* videos, the law firm of Johnson & Rishwain in California decided to represent me on a contingency basis. They suggested we file three claims against the defendants: Copyright Infringement, Breach of Confidence, and Breach of Implied Contract.

1

To this day, I have never met any of the lawyers from Johnson & Rishwain in person. All of our interactions were by phone, fax, e-mail, and traditional mail. That a reputable law firm took the case of a stranger and used its own time and money to fight the case would seem to suggest a high degree of confidence that Quaglia v. Bravo, *et al* had merit. After investing approximately $100,000 in fees and costs, there was an internal struggle between two of the principal attorneys at Johnson & Rishwain. One of the attorneys was in agreement with me on how to proceed with this case. The other attorney had a different approach on how to proceed. Ultimately, Johnson & Rishwain and I were unable to proceed on this case together. However, the fact that those attorneys believed enough in this case to expend so much of their time and money proves that the lawsuit I filed is not frivolous.

I am appealing your March 21, 2006 Memorandum of Decision to the First Circuit Court of Appeals. The first of four, critical, genuine issues of material fact that I am presenting in my appeal is the false testimony that the defendants' attorneys presented to you, Judge Zobel. Bravo's DeMontreux lied in her affidavit. (DeMontreux was the Director of Development and Production for Bravo). See Defendant's Declaration of DeMontreux (#3 Exhibit 1) in Support of Defendant's Joint Motion for Summary Judgment, where DeMontreux states: "While employed at Bravo, I had no professional interaction with Laura Pierce, then Director of Acquisitions for Bravo." (Laura Pierce was the person to whom I had sent *The Ultimate Audition*.)

According to the Pierce Deposition pg. 29, lns. 23-25: "I very rarely would have anything to put fourth *(sic)* for Debbie, but occasionally Debbie might have (cont. on pg. 30, lns. 1-25) something if someone pitched her a series and she thought it really didn't have enough legs for six or twelve episodes of something and she thought it might be a good idea for a special, she might then, you know, speak with me or send me over the pitch letter and the treatment and just say these people might be worth your while to meet with. I don't see a series in here. But

2

maybe you want to meet with them for a special. BY MR. JOHNSON: Q. Did you ever have meetings with her to discuss what was going on creatively at Bravo? What you were doing in your respective offices? A. Yes, sometimes we would have programming meetings where we were both present. Q. Frances Berwick would be there? A. Yes. She was the senior VP of programming. Q. How often did you get together with Berwick and DeMontreux to go over the programming (cont. on pg. 31, lns. 1-7) issues? A. That's hard to say actually. You know it depends. I would say maybe once a month to go through, you know, things that seemed very viable. Things that were rejected, we did not spend time discussing (Exhibit 2)."

Defendants Statement of Undisputed Facts. pg. 13, #69 restates DeMontreux's lie: "While employed at Bravo, Pierce and DeMontreux had no professional interaction with one another beyond casual conversation." (Exhibit 3).

In your March 21, 2006 Memorandum of Decision, you cite: "*Summary Judgment may be granted when 'there is no genuine issue as to any material fact,'* Fed. R. Civ. P. 56(c), *'and when no reasonable jury could find in Plaintiff's favor.'*" (Pg. 2, Par. 3, cont. on Pg. 3). You further cite: "*…Indeed, none of the principals of Zanzibar have ever spoken with Pierce, and the record is devoid of any evidence that DeMontreux and Pierce ever spoke about television programming generally, let alone The It Factor or The Ultimate Audition specifically.*" (Pg.5, 1st Par.)

Laura Pierce's Deposition evidence contradicts Debbie DeMontreux's affidavit, and Defendants' Statement of Undisputed Facts. You based at least some of your above conclusions on the untruthful testimony of DeMontreux. Why would Pierce, another Bravo employee, lie about having a professional relationship with DeMontreux? DeMontreux lied when she denied having a professional relationship with Laura Pierce to distance herself from the fact that she had access to and, indeed, did watch *The Ultimate Audition*. DeMontreux lied

3

because she had suppressed Zanzibar's written, expressed ideas and substituted my expression of ideas from *The Ulitmate Audition* for *The It Factor*.

To the best of my ability, I have presented accurate evidence to the court. I have spent approximately $2,500 of my money on this case, which may seem like a pittance to some, but which is a small fortune to me. I spent approximately $1,400 on *The It Factor* raw footage videos that I had dubbed at Du Art in New York City. I reviewed all one hundred hours of raw video footage over the course of eight weeks. In all, I have spent a great deal of time and energy since 2002 to fight this case.

Even though I am exhausted from this case—even though I have been physically sick, at times, due to this case—even though my family forfeited last summer's camping vacation so I could pay $1,400 for *The It Factor* video raw footage—even though the odds from the beginning have been stacked against me—even though the odds are, even now, stacked higher against me, since only a small percentage of judges' decisions are overturned—even though I am one man without any legal background going up against some of the best entertainment attorneys in the country—even though one of the defendant's attorneys, Barry Slotnik, told me that the defendants would not seek attorneys' fees and costs from me if I would agree not to file an appeal—I will file that appeal to the First Circuit Court of Appeals because I believe the defendants stole many years of my life's work.

In conclusion, I do not have the resources to fight this case properly. I have been overwhelmed emotionally, physically, and financially by this case. As stated above, I have been unemployed since December, 2005. However, I continue to fight this case for all the sponsors and investors who believed in me and provided goods, services, and money to make *The Ultimate Audition*. I continue to fight for the actors who participated in my movie; they deserved the exposure that the defendants deprived them of. I continue to fight this case as

4

an obligation to my former attorneys, Johnson & Rishwain, who invested their valuable time and money in a case they believed in. They have a stake in the case's outcome, if they are to recover their fees and costs. Most importantly, I fight this case for my family, who deserve the fruits of my many years of labor that the defendants stole from me. As stated previously, I have never sued any person or entity for money in all my 44 years. I have spent more time on fighting this case than on any other thing in my life, other than the two movies I have made. My intentions are honorable and sincere, and I am determined to do everything within my power to right the wrong the defendants have done to me and my family.

My family and I will be financially devastated, should you choose to order me to pay the defendants' legal fees and costs. I request that you rule against the Defendants' Joint Motion For Attorneys' Fees and Costs.

Respectfully submitted,

*Frank Quaglia*
Frank Quaglia (pro se) Plaintiff

Dated April 18, 2006